No. 44,026

J. P. Harris, Peter MacDonald, John McCormally, and The Hutchinson Publishing Company, a corporation, *Plaintiffs*, v. John Anderson, Jr., in his official capacity as Governor of Kansas; Paul R. Shanahan, in his official capacity as Secretary of State of the State of Kansas; Viola Pritchard, Commissioner of Elections of Shawnee County, Kansas, and Emogene Wineinger, County Clerk of Greeley County, Kansas, individually as such Election Commissioner and County Clerk of their respective counties, and as representatives of all Election Commissioners and County Clerks of the State of Kansas, *Defendants*.

(400 P. 2d 25)

Opinion filed March 1, 1965.

W. Y. *Chalfant*, of Hutchinson, argued the cause, and H. R. *Branine* and C. E. *Chalfant*, of Hutchinson, were with him on the briefs for plaintiffs.

J. *Richard Foth*, Assistant Attorney General, argued the cause, and *William M. Ferguson*, Attorney General, and *Park McGee*, Assistant Attorney General, were with him on the briefs for defendants.

The opinion of the court was delivered by

FATZER, J.: In this original action sounding in quo warranto (K. S. A., 20-101a), it is alleged and claimed that the apportionment provisions of the Kansas Constitution, Article 2, Section 2, and Article 10, Section 1, and Chapter 2, of the 1964 Special Session of the legislature, apportioning the seats of the House of Representatives, were rendered unconstitutional and void by the decision of the Supreme Court of the United States in *Reynolds v. Sims* (June 15, 1964), 377 U. S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362, holding that,

". . . as a basic constitutional standard, the Equal Protection Clause requires that the seats in both houses of a bicameral state legislature must be apportioned on a population basis. Simply stated, an individual's right to vote for state legislators is unconstitutionally impaired when its weigtht is in a substantial fashion diluted when compared with votes of citizens living in other parts of the State. . . ." (12 L. Ed. 2d 531.))

Subsequent quotations from *Reynolds* will be found in 12 L. Ed. 2d.

The holding was based on the premise that the right to vote for the candidate of one's choice is of the essence of the representative form of government, and that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise" (pp. 522, 523); that "Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities or economic interests" (p. 527); that "our legislatures are those instruments of government elected directly by and directly representative of the people" (p. 527); that "all voters, as citizens of a state, stand in the same relation regardless of where they live" (p. 529); that "diluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amend-

ment just as much as invidious discriminations based upon factors such as race . . . or economic status" (pp. 529, 530); and that "the Equal Protection Clause demands no less than substantially equal state legislative representation for all citizens, of all places as well as of all races." (p. 531.)

In holding that, as a federal constitutional requisite, both houses of a state legislature must be apportioned on a population basis, the court stated "we deem it expedient not to attempt to spell out any precise constitutional tests" (p. 537); that what is "marginally permissible in one State may be unsatisfactory in another" (p. 537); and that it intended to state "only a few rather general considerations which appear to us to be relevant" (p. 537), which it denominated as "discoverable" and "manageable" standards or applicable guidelines for implementing its decision in *Baker v. Carr*, 369 U. S. 186, 7 L. Ed. 2d 663, 82 S. Ct. 691, in determining the constitutionality of a state legislative apportionment plan. We further quote and summarize from the opinion:

"A State may legitimately desire to maintain the integrity of various political subdivisions, insofar as possible, and provide for compact districts of contiguous territory in designing a legislative apportionment scheme. . . ."

It was then stated that one state might prefer single-member districts while another state might desire to achieve some flexibility by creating multi-member districts, but that, "the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the State." (p. 537.) The opinion stated:

"History indicates, however, that many States have deviated, to a greater or lesser degree, from the equal-population principle in the apportionment of seats in at least one house of their legislatures. So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, some deviations from the equal-population principle are constitutionally permissible with respect to the apportionment of seats in either or both of the two houses of a bicameral state legislature. But neither history alone, nor economic or other sorts of group interests, are permissible factors in attempting to justify disparities from population-based representation. Citizens, not history or economic interests, cast votes. Considerations of area alone provide an insufficient justification for deviations from the equal-population principle. Again, people, not land or trees or pastures, vote. Modern developments and improvements in transportation and communications make rather hollow, in the mid-1960's, most claims that deviations from population-based representation can validly be based solely on geographical considerations. Arguments for allowing such deviations in order to insure

effective representation for sparsely settled areas and to prevent legislative districts from becoming so large that the availability of access of citizens to their representatives is impaired are today, for the most part, unconvincing.

"A consideration that appears to be of more substance in justifying some deviations from population-based representation in state legislatures is that of insuring some voice to political subdivisions, as political subdivisions. Several factors make more than insubstantial claims that a State can rationally consider according political subdivisions some independent representation in at least one body of the state legislature, as long as the basic standard of equality of population among districts is maintained. Local governmental entities are frequently charged with various responsibilities incident to the operation of state government. In many States much of the legislature's activity involves the enactment of so-called local legislation, directed only to the concerns of particular political subdivisions. . . ." (pp. 537, 538.)

It was further stated:

". . . And a State may legitimately desire to construct districts along political subdivision lines to deter the possibilities of gerrymandering. *However, permitting deviations from population-based representation does not mean that each local governmental unit or political subdivision can be given separate representation, regardless of population. Carried too far, a scheme of giving at least one seat in one house to each political subdivision (for example, to each county) could easily result, in many States, in a total subversion of the equal-population principle in that legislative body. This would be especially true in a State where the number of counties is large and many of them are sparsely populated, and the number of seats in the legislative body being apportioned does not significantly exceed the number of counties. Such a result, we conclude, would be constitutionally impermissible.* And careful judicial scrutiny must of course be given, in evaluating state apportionment schemes, to the character as well as the degree of deviations from a strict population basis. But if, even as a result of a clearly rational state policy of according some legislative representation to political subdivisions, population is submerged as the controlling consideration in the apportionment of seats in the particular legislative body, then the right of all of the State's citizens to cast an effective and adequately weighted vote would be unconstitutionally impaired." (pp. 538, 539.) (Emphasis supplied.)

The majority court then formulated arithmetic-absolute standards under the Equal Protection Clause of equal-populated districts for both houses of a bicameral legislature. Those standards are expressed in various phrases as "substantial equality of population among the various districts" (p. 537); "as nearly of equal population as is practicable" (p. 536) and "approximately equal" (p. 537), but that "mathematical exactness or precision is hardly a workable constitutional requirement" (p. 536), which is all characterized by the goal of "full and effective participation by all citizens in state government" (p. 529), and even more clearly that "fair and effective

representation for all citizens is concededly the basic aim of legislative apportionment." (p. 529.)

We acknowledge that Kansas as a state of the Union must recognize as binding an amendment to the Constitution of the United States from the time of its adoption and must enforce it within its own territorial limits, notwithstanding any inconsistent provisions in our Constitution or statutes. *Neal v. Delaware,* 103 U. S. 370, 26 L. Ed. 567, held that the adoption of the Fifteenth Amendment had the effect in law to render inoperative a state constitutional provision which restricted the right of suffrage to the white race. See, *Gunn v. Barry,* 82 U. S. 610, 21 L. Ed. 212. See, also, 11 Am. Jur., Constitutional Law, Sec. 41, p. 648, and Anno: 71 A. L. R. 1332, dealing with the Nineteenth Amendment which automatically struck out the word "male" wherever it was used in a state constitution or statute defining electors.

When the Constitution of Kansas was adopted in 1859, original Article 2, Section 2, provided that the first House of Representatives would consist of 75 members chosen for one year and the first Senate would consist of 25 members chosen for two years, and after the first election the number of senators and members of the House of Representatives was to be regulated by law, but never to exceed 100 representatives and 33 senators.

In 1873, the people amended Article 2, Section 2, hereafter quoted, and enlarged both houses of the legislature. With the formation of five western counties in 1887, the last of the present 105 counties were organized. The provisions of the Constitution of Kansas dealing with apportionment read:

"The number of representatives and senators shall be regulated by law, but shall never exceed one hundred and twenty-five representatives and forty senators. From and after the adoption of the amendment the house of representatives shall admit one member from each county in which at least two hundred and fifty legal votes were cast at the next preceding general election; and each organized county in which less than two hundred legal votes were cast at the next preceding general election shall be attached to and constitute a part of the representative district of the county lying next adjacent to it on the east." (Art. 2, § 2.)

"In the future apportionment of the state, each organized county shall have at least one representative; and each county shall be divided into as many districts as it has representatives." (Art. 10, § 1.)

"It shall be the duty of the first legislature to make an apportionment, based upon the census ordered by the last legislative assembly of the territory; and a new apportionment shall be made in the year 1866, and every five years thereafter, based upon the census of the preceding year." (Art. 10, § 2.)

Members of the Senate are elected for a four-year term and members of the House of Representatives are elected for a two-year term (Art. 2, § 29), and the legislature has provided that the Senate shall consist of 40 members and the House of Representatives shall consist of 125 members. (K. S. A. 4-101.)

The foregoing constitutional provisions were construed and applied in *Harris v. Shanahan* (Dec. 5, 1963), 192 Kan. 183, 387 P. 2d 771, holding the 1963 apportionment of the Senate (Ch. 13, Laws 1963), and the 1961 apportionment of the House of Representatives (G. S. 1961 Supp., 4-103) to be unconstitutional and void. They were likewise construed and applied in *Harris v. Shanahan,* (March 30, 1964), 192 Kan. 629, 390 P. 2d 772, which judicially approved Senate Bill No. 2 and House Bill No. 2 of the 1964 Special Session of the legislature. (Chs. 1 and 2, Laws 1964 Special Session), apportioning the state into 40 senatorial districts of approximately equal population and apportioning one member of the House of Representatives to each of the 105 counties, and then apportioning the 20 seats not allocated on a geographical basis to counties entitled to them by virtue of population in accordance with the method of equal proportions.

Our legislature is bicameral and the legislative power of this state is vested in a Senate and House of Representatives. (Art. 2, § 1.) Simply stated, the rationale of the Kansas apportionment plan is that the seats of one house (the Senate) shall be apportioned equally on the basis of population and the seats of the other house (the House of Representatives) shall be apportioned both on a population and a geographical basis. In *Harris v. Shanahan* (March 30, 1964), supra, it was said:

". . . in the apportionment of the state into senatorial districts, the legislature is not confined to county boundary lines, but the resulting districts should, where possible, be compact and contain a population and area as similar as may be in its economic, political, and cultural interests, all as determined by the legislature in its discretion, not acting arbitrarily or capriciously." (l. c. 632.)

It was also said:

". . . it was recognized by those who framed the Constitution that the districts of the House of Representatives were to be apportioned to the several counties, that is, each organized county was to have at least one representative and seats not allocated on a geographical basis were to be apportioned to counties properly entitled to them by virtue of population, and each county entitled to more than one such seat was to be divided into as many districts equal or substantially equal in population as it had representatives. In no case

was a representative district to include territory in more than one county." (l. c. 632, 633.)

Despite the fact that our constitutional apportionment plan was uniquely designed to meet the particular characteristics and needs of Kansas, we are told in *Reynolds* in the terms of an absolute, that, under the stipulated and admitted facts in the case at bar, the Kansas apportionment plan (Ch. 2, Laws 1964 Special Session) and Article 2, Section 2, and Article 10, Section 1, of our Constitution are unconstitutional because they invidiously discriminate against any person residing in any district mathematically disfavored as a result of the "weighing of representation," and that to conform to the federal constitutional requisite therein announced, the House of Representatives must be reapportioned.

The plaintiffs allege, and the parties' written agreement of the facts confirm, that, based upon the 1963 official state census, the official population for the year preceding the enactment of the current House apportionment, and upon which it was based, was 2,172,296. If the 125 House seats were apportioned equitably on the basis of population alone, each district would have had an average of 17,378 people. Under the current apportionment act *Saline County is the largest populated district in the state and it was apportioned only one representative*, and it has 21.3 times the population of Greeley County which likewise was apportioned only one representative. Moreover, the smallest county (Greeley) has 12.9 percent of the population of an ideal or average-sized district, and the largest county (Sedgwick) has 18.536 times the average district's population. Again, using the 1963 figures, the 63 least populated counties (districts), being the majority necessary to enact legislation, were inhabited by 411,792 people, or approximately 19 percent of the state's total population, while the 84 least populated counties (districts), being the two-thirds majority required for submission of constitutional amendments or to convene a constitutional convention (Art. 14, §§ 1 and 2), were inhabited by 763,093 people, or approximately 35 percent of the state's population. By contrast, the state's four largest counties alone contained 827,123 people in 1963, or approximately 38 percent of the state's total population, while apportioned only 23 representatives, although these 23 seats represent more people than do the 84 smallest counties (districts) which control a two-thirds majority vote in the House of Representatives. The 1964 official state census would result in approximately

the same ratios of representation insofar as the 63 and 84 least populated counties are concerned. However, there would be a shift in the ratio of representation between two of the largest populated counties.

This action attacks only the apportionment of the seats in the House of Representatives. As previously indicated, 105 of the 125 seats of that house are apportioned to each of the 105 counties on a geographical basis (of which 30 counties have a population exceeding the ideal or average-sized district), and the remaining 20 seats are apportioned to counties solely by population in accordance with the method of equal proportions. Having laid down the rule that both houses of a bicameral legislature must be apportioned on a population basis but that a certain degree of variance is constitutionally permissible so long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy, the majority in *Reynolds* then warns that divergences from population-based representation does not mean that each local governmental unit or political subdivision can be given separate representation regardless of population, and that if carried too far, "a scheme of giving at least one seat in one house to each political subdivision (for example, to each county) could easily result . . . in a total subversion of the equal-population principle in that legislative body." (p. 538.) Further, that "this would be especially true in a State where the number of counties is large and many of them are sparsely populated, and the number of seats in the legislative body being apportioned does not significantly exceed the number of counties." (p. 538.)

We are not enlightened by the word "significantly." Does it mean 20, 30, 40, or how many seats? If the word was used to mean that the number of seats in the legislative body being apportioned must exceed the number of counties by such number that the vote of any citizen in any district created by the apportionment is approximately equal in weight to that of any other citizen in the state, then it is evident that the 20 seats apportioned to the more populous Kansas counties in accordance with the method of equal proportions are insufficient in number to provide equal-populated districts in accordance with the federal constitutional requisite. This is indicated by the fact that the 63 least populated counties, being the majority necessary to enact legislation, are controlled

by 411,792 people, or approximately 19 percent of the state's total population, while the four largest counties alone contain 827,123 people, or approximately 38 percent of the state's total population, and are apportioned only 23 seats on both a geographical and population basis.

In light of the decisions of the Supreme Court of the United States in *Reynolds v. Sims,* supra; *WMCA v. Lomenzo,* 377 U. S. 633, 12 L. Ed. 2d 568, 84 S. Ct. 1418; *Maryland Committee v. Tawes,* 377 U. S. 656, 12 L. Ed. 2d 595, 84 S. Ct. 1429; *Davis v. Mann,* 377 U. S. 678, 12 L. Ed. 2d 609, 84 S. Ct. 1441; *Roman v. Sincock,* 377 U. S. 695, 12 L. Ed. 2d 620, 84 S. Ct. 1449; *Lucas v. Colorado General Assembly,* 377 U. S. 713, 12 L. Ed 2d 632, 84 S. Ct. 1459; *Meyers v. Thigpen,* 378 U. S. 554, 12 L. Ed. 2d 1024, 84 S. Ct. 1905; *Williams v. Moss,* 378 U. S. 558, 12 L. Ed. 2d 1026, 84 S. Ct. 1907; *Hearne v. Smylie,* 378 U. S. 563, 12 L. Ed. 2d 1036, 84 S. Ct. 1917; *Pinney v. Butterworth,* 378 U. S. 564, 12 L. Ed. 2d 1037, 84 S. Ct. 1918; *Scranton v. Drew,* 379 U. S. 40, 13 L. Ed. 2d 107, 85 S. Ct. 207, and *Hill v. Davis,* 378 U. S. 565, 12 L. Ed. 2d 1037, 84 S. Ct. 1918, establishing federal constitutional requisites for state legislative apportionment, a majority of this court is of the opinion that under the Supremacy Clause of the Constitution of the United States (Article VI), the existing constitutional and statutory apportionment system of Kansas violates the Equal Protection Clause of the Fourteenth Amendment with respect to the House of Representatives.

We, therefore, have the distasteful task of implementing the rule laid down in *Reynolds* and related cases under the Equal Protection Clause of the Fourteenth Amendment, which we are required to hold to be binding upon this state under the Supremacy Clause of the Constitution of the United States, so long as the majority of the members of the Supreme Court of the United States continue to adhere to that constitutional concept. The highest court of the land has announced the rule that both houses of a bicameral state legislature must be apportioned on a population basis. We are sworn to uphold the Constitution of the United States and the Constitution of the state of Kansas, but under the Supremacy Clause, the Constitution of the United States is the supreme law of the land. The Fourteenth Amendment has been so construed to require that we hold, as we now do, that the existing apportionment plan of the Kansas House of Representatives is unconstitutional as violating the

Equal Protection Clause of the amendment. Hence, we declare inoperative that portion of Article 2, Section 2, of the Constitution of Kansas, which reads:

"From and after the adoption of the amendment the house of representatives shall admit one member from each county in which at least two hundred and fifty legal votes were cast at the next preceding general election; and each organized county in which less than two hundred legal votes were cast at the next preceding general election shall be attached to and constitute a part of the representative district of the county lying next adjacent to it on the east."

and that portion of Article 10, Section 1, which reads: "each organized county shall have at least one representative; and . . ." Further, we hold invalid the existing apportionment of the House of Representatives contained in House Bill No. 2 of the 1964 Special Session of the legislature.

In view of conclusions announced in *Reynolds*, the legislature is again called upon to face the unhappy and difficult task of reapportioning the House of Representatives. In performing that duty, this court will endeavor to exercise all the patience and understanding it is permitted within the limitations of *Reynolds*, and will approve any reasonable plan of the legislature which does not result in arbitrary classification or unreasonable departure from the equal population principle recently declared to be a federal constitutional requisite.

In *Maryland Committee v. Tawes*, supra, the Supreme Court of the United States stated that under no circumstances should further elections be permitted to be conducted under any unconstitutional apportionment plan. The 1966 election is the next election of members of the House of Representatives. Under K. S. A. 25-204 and 25-311, the secretary of state is charged with initiation of acts precedent to the holding of primary and general elections, that is, the preparation of notices of the primary election and the certification of nominees for the general election. That process will be initiated by him by giving notice of the 1966 primary election on or before April 2, 1966. Information as to representative districts must necessarily be in his hands for a sufficient time prior to that date to permit proper preparation of the required notices.

This court makes no indication of when or at what legislative session—the 1965 Regular Session of the legislature or a Special Session called by the governor following the 1966 Budget Session—the legislature should enact a proper and valid apportionment of

the House of Representatives in accordance with the constitutional requisite announced in *Reynolds,* supra. However, it feels certain that the legislature will enact a valid apportionment act apportioning the state into representative districts in conformity with that constitutional requisite, in ample time so that the secretary of state will have proper and necessary information as to such representative districts at a reasonable time prior to April 2, 1966.

For the purpose of affording the legislature ample opportunity to undertake the necessary reapportionment, we withhold further determination of this action, retaining jurisdiction to hear the matter further and to take such additional action as is deemed advisable and within such reasonable time as the circumstances require.

FATZER, J., dissenting: This case involves what is in simple truth one of the gravest constitutional crises ever to face this state, however ill-understood it may be. Broadly speaking, the grave issue is whether this nation will become a consolidated government absolute in its jurisdiction, with state governments existing only to exercise their powers by its sufferance, or remain a union of states and a nation of people as intended by the founding fathers.

I do not voice the equivalent of the ancient protest of the defeated litigant, nor do I wish to be intransigent, nor participate in any popular hue and cry against the majority's decisions on state apportionment, nor give any comfort to malapportionment in states where their legislative bodies have failed to reapportion themselves as required by their own constitutions thereby frustrating the will of the majority of their citizens. I concede that under the Supremacy Clause (Art. VI) I am legally and honor bound to comply with the Constitution of the United States and its various amendments, including the Fourteenth, and enforce them without reference to any inconsistent provisions in the Kansas Constitution. Moreover, I agreeably accept decisions of the Supreme Court of the United States manifesting an obvious basis in the Constitution, but the Supremacy Clause places a heavy burden on a judge of a state court to apply a course of decisions which he believes to be unfounded in constitutional authority and represent nothing less than action by a majority of six members of the Supreme Court of the United States to enforce a federal right by an unwarranted interpretation where in fact no federal right exists under the Constitution. There is no law nor logic that requires any judge of a state court under the Supremacy Clause to apply the result of such action as the end

product of the "aristocracy of the robe" (1 Burgess, Political Science and Constitutional Law, p. 365) or by what Judge Learned Hand more bluntly characterized as a "bevy of Platonic Guardians." (L. Hand, The Bill of Rights, p. 73.)

The state of Kansas played an integral part in the ratification of the Fourteenth Amendment, and I cannot remain silent and ignore the grave constitutional question implicit in *Reynolds v. Sims,* 377 U. S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362, and related cases, when the consequences are so serious, so far-reaching and pervading and so great a departure from the structure, experience and spirit of our free institutions; when the effect is to fetter and degrade, and in fact radically change the whole fundamental character of the relations of the state and federal governments and of the state governments to the people, in the absence of language in the Fourteenth Amendment which expresses such a purpose to clearly admit of no doubt. As stated by Dr. Alfred de Grazia, "To take away from the constitutional authorities of a State (beginning with its very constitutional convention and its constitution) the right to determine the character of its representative system would be a powerful blow against American federalism. For the Supreme Court, itself unelective, to demolish partially the representative structure of the States on some wholly inferred and rarely practical doctrine of 'equal-populations districts' would be the crowning irony in the history of judicial law-making." (Apportionment and Representative Government, p. 160.)

In the same vein, Mr. Justice Stewart, joined by Mr. Justice Clark, stated that the majority's pronouncement making unconstitutional the legislatures of most of the 50 states, "finds no support in the words of the Constitution, in any prior decision of this Court, or in the 175-year political history of our Federal Union." (*Lucas v. Colorado General Assembly,* 377 U. S. 713, 12 L. Ed. 2d 632, 583, 84 S. Ct. 1459, dissenting.) Likewise, Mr. Justice Harlan said that the majority's decision "amounts to nothing less than an exercise of the amending power by this Court," and, "in the name of constitutional interpretation, the court *adds* something to the Constitution that was deliberately excluded from it," and "in reality substitutes its view of what should be so for the amending process." (*Reynolds v. Sims,* supra, pp. 545, 563 of 12 L. Ed. 2d, dissenting, [subsequent quotations from *Reynolds* are from 12 L. Ed. 2d].) Moreover, Mr. Justice Frankfurter has stated, "to find such a polit-

ical conception legally enforceable in the broad and unspecific guarantee of equal protection is to rewrite the Constitution. See *Luther v. Borden* (U. S.) 7 How. 1, 12 L. Ed. 2d 581." ( Dissenting, *Baker v. Carr*, 369 U. S. 186, 7 L. Ed. 2d 663, 734, 82 S. Ct. 691.)

Acquiescence in decisions of the Supreme Court is undoubtedly borne, in a large part, of a deep-rooted respect for law and for the Supreme Court as the highest judicial authority in the land. However, respect for the court is misdirected insofar as it engenders a docile submission to a decision such as *Reynolds* which challenges and strikes down the structure and organization of the political institutions of the states, and it is in the long-term interest of the court and the nation that this respect should not become a servile abasement.

The notion of judicial self-restraint seems to have fallen out of favor with the majority of the court, and although it fails to impose self-limitations upon the exercise of its judicial power, it should be remembered that:

". . . However the Court may interpret the provisions of the Constitution, it is still the Constitution which is the law and not the decision of the Court. 'To the decision of an underlying question of constitutional law no . . . finality attaches. To endure, it must be right.' . . ." (3 Warren, The Supreme Court in United States History, p. 470.)

With respect to judicial opinions of judges acting as legislators who fail to distinguish between right and power, Mr. Justice Cardozo said:

". . . Judges have, of course, the power, though not the right, to ignore the mandate of a statute [constitutional provision], and render judgment in despite of it. They have the power, though not the right, to travel beyond the walls of the interstices, the bounds set to judicial innovation by precedent and custom. None the less, by that abuse of power, they violate the law. . . ." (Cardozo, The Nature of the Judicial Process, p. 129.)

It is the first duty of all to preserve the Federal Constitution in its true sense, but when a judicial opinion purports to confer a federal right where no right is given, or which reaches beyond the federal power which the Constitution confers or restricts, it then becomes no longer judicial review but judicial supremacy through judicial usurpation of power and is not binding upon state courts or judges under the Supremacy Clause.

"Article 6, Section 2 of the Federal Constitution, because it declares only the *supremacy of the Constitution*, treaties and *'laws of the United States which shall be made in pursuance thereof,'* only affirms a supremacy of the Constitution, treaties and laws. To this statement of supremacy of the Con-

stitution, treaties and laws made in *pursuance* thereof, the counterpart or counterposition must, therefore, also be obvious and true, and that is that acts or powers exercised by the Federal Government, or any department thereof, *contrary to the Constitution* or contrary to reserve powers of the States, cannot under the declaration of supremacy (Article 6, Section 2) be constitutional or valid." (Call, Constitution v. Supreme Court, 11 Baylor L. Rev., pp. 383, 400.)

I insist that judicial errors of reasoning be judicially corrected. Particularly, where historical facts and the experiences and traditions of our people and our laws preclude the assumption of judicial power which is turning a constitutionally federated republic into a consolidated government. Otherwise, "to attribute such a power to the Judiciary would be intolerable; but it is of the highest importance that the Judiciary should always be pervious to demonstration of judicial error as to the original meaning of the Constitution, and be prepared to correct its own mistakes." (3 Warren, *op. cit., supra,* p. 471.) "The tide rises and falls but the sands of error crumble." (Cardozo, *op. cit., supra,* p. 177.)

In view of the foregoing, and for reasons hereafter stated, I think it can be established beyond doubt that the conclusions announced in *Reynolds* are not only unauthorized by the Fourteenth Amendment, but represent nothing less than the act of the majority attempting to write its own amendment to the Constitution of the United States in clear violation of the Fifth (V) Article, and such conclusions, being without sanction of law, *are not the Constitution of the United States,* and are not binding upon state courts or the judges of those courts under the Supremacy Clause of the Sixth (VI) Article.

It is important to here note what the real issues are. This is not a case involving the legislature's apportionment of congressional districts for seats in the *Federal* House of Representatives which have been allocated to Kansas by the method of equal proportions (2 U. S. C. A., § 2a), as was involved in *Wesberry v. Sanders,* 376 U. S. 1, 11 L. Ed. 2d 481, 84 S. Ct. 526, and recently involved in the federal district court of Kansas, which ordered our legislature to reapportion the five congressional districts according to approximately equal population. (*Meeks v. Anderson,* 228 F. Supp. 217). *Wesberry* involved only the direct application of *Federal* power expressly conferred by Article 1, Section 2 of the Constitution, that congressmen to be chosen "by the People of the several states," and from districts which are "nearly as is practicable" equal in popula-

tion. *Wesberry* announced, in effect, the same conclusion this court announced in *Harris v. Shanahan,* 192 Kan. 183, 387 P. 2d 771. The Federal Constitution apportions seats on a geographical basis by providing that each state shall have at least one representative, the same as the Kansas Constitution provides that each county shall have at least one representative. The membership of the House of Representatives has been fixed at 435 (2 U. S. C. A. § 2), leaving 385 seats to be apportioned to the several states on the basis of population in accordance with the method of equal proportions. (2 U. S. C. A. § 2a.) The Supreme Court of Kansas held that the twenty seats which remained unapportioned after a geographical assignment of one to each county, were required to be apportioned to the counties entitled to them on a population basis in accordance with the method of equal proportions, and with respect to those seats it further held that each representative district was to have approximately equal numbers. That was the holding in *Wesberry* with respect to congressional districts. The difference between the two cases is that in *Wesberry* federal power is conferred by the Constitution of the United States (Art. 1, § 2), whereas the power to apportion the Kansas House of Representatives is conferred by the Kansas Constitution (Art. 2, § 2; Art. 10, § 1.)

Likewise, *Gray v. Sanders,* 372 U. S. 368, 9 L. Ed. 2d 821, 83 S. Ct. 801, was not a representation case, as is the case before us, and involved the quite different issue of election of senators, congressmen and state-wide officers from a single constituency—the entire state—in which it would be difficult to rationalize any other standard for a state-wide election than that of equality of voting. Indeed, that voting rule was established by the Kansas Constitution (Bill of Rights, §§ 1, 2) when it was adopted and that right has been jealously guarded and protected even since. In all state-wide, county-wide, district-wide, and township-wide elections every qualified elector in the single constituency has the right to freely vote for the candidate of his choice, who is elected by a majority of those voting for him. *Gray* was simply a state-wide voting case, and the opinion expressly conceded it had nothing to do with the composition of a state legislature and did not involve any question under the Equal Protection Clause. Neither *Wesberry* nor *Gray* have the slightest bearing on this case.

What is here involved is the right of Kansas to determine the basis of representation of its own legislature, and to what extent,

if any, our constitutional apportionment mandate providing for an apportionment of the Senate on a population basis and the House of Representatives on both a population and geographic basis runs afoul of any restriction imposed by the Equal Protection Clause of the Fourteenth Amendment. The majority's answer is in terms of an absolute—the Equal Protection Clause "requires that the seats in both houses of a bicameral legislature must be apportioned on a population basis." (p. 531.) Whatever may be thought of such requirement as a piece of political philosophy, it is beyond the jurisdiction of the majority to mold and sterotype national policy, and it is not authorized to add something by a unwarranted interpretation of the Fourteenth and Fifteenth Amendments, which was deliberately excluded, and impose upon the states as a rule of law, such a requirement. The holding in *Reynolds* is in utter disregard of historical facts, and infringes upon fundamental principles as they have been understood by the experiences and traditions of our people and our law for more than 100 years. (Cardozo, *op. cit., supra,* p. 80.) It has been unanswerably demonstrated that equal populated representative districts "was not the colonial system, it was not the system chosen for the national government by the Constitution, it was not the system exclusively or even predominately practiced by the states at the time of the adoption of the Fourteenth Amendment, it is not predominately practiced by the states today." (*Baker v. Carr,* supra., Frankfurther, J., dissenting, p. 735.)

The apportionment process has always been, by its very nature, political, and the "political thicket" envisioned by Mr. Justice Frankfurter in *Colegrove v. Green,* 328 U. S. 549, 90 L. Ed. 1432, 66 S. Ct. 1198, has become no less political because the eminent justices of the Supreme Court of the United States have now entered the field. So long as representative government exists, there will be partisan politics in reapportionment which permeates the entire problem. As Mr. Justice Frankfurter stated, "in every strand of this complicated, intricate web of values meet the contending forces of partisan politics." (*Baker v. Carr,* supra, Frankfurter, J., dissenting, p. 747.) Apportionment is politics, and in politics no one is neutral. That fact has manifested itself in the events of political history, and was ever present at the birth of this nation in Philadelphia in 1787.

The problem of the delegates at that convention was to frame

a constitution that the people would accept. Their second problem was to frame governmental machinery that would work and which would consolidate conflicting interests: State-sovereignty men who wanted merely to patch up the unworkable Articles of Confederation versus nationalists pressing for a strong central government even tinged with elements of monarchy; big states versus little states, each party fearful and jealous of the other; north versus south, with differing economics and cultures; trade and commerce versus agriculture with conflicting interests. But above all, representation in the Congress was the controversy which produced the most serious disagreement, even to the point of threatening dissolution of the convention. The delegates of big states insisted that the union of states should be based entirely on people; that the House of Representatives should be based on the people, and that representation in the Senate of the United States should be in proportion to the people. The little states, through their spokesman, contended the union should be based on the states as states, and threatened to confederate with a foreign power. But out of this deadlock came the so-called Great Compromise of the convention: That this nation would not be based on states alone nor would it be based on people alone; that the Senate of the United States would be based on the states, and the House of Representatives would be based on people. As a result of the compromise between the sovereignty of the states and the over-all consolidated sovereignty of the people, we are today, under the Constitution, a union of states and a nation of people. (James Madison's report of the "Debates in the Federal Convention of 1787" [House Document No. 398, 69th Congress, first session, entitled "Documents Illustrative of the Formation of the Union of the United States of America"].) See, also, 1 Farrand, The Records of the Federal Convention of 1787. This is the distilled essence of our republican form of government.

But disagreements and controversies were not limited to the Constitutional Convention of 1787. Kansas was forged and tempered in the fires of controversy. It suffered from the ills of the nation; there was more than mere partisan politics; there was guerilla war. Following an intense period of violence and bloodshed, the contest became almost entirely a political struggle between the proslavery and the free-state settlers, each side trying to win the state by securing control of its government. The Fifth

Session of the Kansas Territorial legislature which convened in Lecompton and concluded in Lawrence during the months of January and February, 1859, enacted the Constitutional Convention Act providing "for the formation of a Constitution and State Government for the state of Kansas." (Territorial Laws of 1859, Ch. XXXI.) This was the fourth attempt of the people to form a state government.

Fifty-two delegates from both political parties were elected to the convention from districts which were apportioned on population. The convention met in Wyandotte on Tuesday, July 5, 1859, and the proceedings and debates of that convention are recorded in the Proceedings and Debates, Wyandotte Constitutional Convention, 1859, hereafter cited as Wyandotte.

Almost immediately the question of representation presented itself, and on Thursday, July 7, the question of apportionment first arose. Mr. Greer, of Shawnee County, offered a resolution which would direct the secretary of the territory to furnish to the convention an abstract statement showing the census of the several counties of the territory, taken under the act of the last legislative assembly. Mr. Griffith, of Bourbon, moved to amend the resolution by requesting the secretary of the territory "to address a letter to the clerks of the counties included in their districts, requesting them to forward by mail to this Convention an abstract of the census returns under seal, in file in their office." (Wyandotte, p. 37.) Mr. Greer accepted Mr. Griffith's amendment and the resolution, as amended, was adopted. On the following day, Friday, July 8, the question again arose when Mr. McClelland, of Jefferson County, moved to send messengers to the country "to get the census returns, in order that this Convention may be the better enabled to make a just apportionment." (Wyandotte, p. 66.) Mr. Thacher, of Douglas County, opposed, thinking it unwise and expensive, stating that no census was taken in some of the counties, because "they did not know the law"; that "the laws are locked up safe in Lawrence." (Wyandotte, p. 66.) The debate continued, and on a voice vote Mr. McClelland's motion was rejected.

On Wednesday, July 20, the Committee on Apportionment made its report to the convention, which was in three sections. The first section provided that, "every organized county shall have at least one Representative, and unorganized shall be attached to those that are organized." (Wyandotte, p. 357.) The second section pro-

vided for apportionment every fifth year, and the third section
temporarily apportioned the state into senatorial and legislative dis-
tricts until there was a new apportionment.   Mr. McDowell, of Leav-
enworth County, stated:

"Mr. President, I suppose it will be in order for me to state (having been
on the Committee on Apportionment), that the report of the committee does
not meet in any sense my approbation. I think it is unjust and unfair, and
gotten up obviously for political purposes. In no sense do I, as a member of
that committee, sanction it." (Wyandotte, p. 358.)

Mr. Slough, of Leavenworth County, was recognized:

"Mr. President, I propose to offer a resolution with reference to the re-com-
mitment of this report, and I desire to state my reasons for so doing.   I submit
the following:

" '*Resolved,* That the report of the committee on Apportionment be re-com-
mitted, and that the members of each district be required to make a return to
said committee under oath of the population of their respective districts, in
accordance with their best information and belief; and that said committee be
instructed to report an apportionment in accordance with said returns.' " (Wyan-
dotte, p. 359.)

and stated his reasons in support of the resolution.  Mr. Griffith, of
Bourbon County, was recognized, and stated:

"Mr. President, I move to amend by attaching these words: 'Provided, that
they shall give each organized county at least one representative.' " (Wyandotte,
p. 359.)

The following are exerpts from the debate that followed:  Mr.
McDowell stated:

"Mr. President, *I think that population rather than counties should be the*
predicate of an apportionment, and that an organized county should not be en-
*titled to a representative, unless it has a population sufficient to entitle it.*
I suppose the object of this whole scheme is to have the people of the Territory
in their law-making departments of government; and that object, it seems to
me, is best attained—more equally, fairly and justly attained—by arriving at,
in the first place, an approximation to the population, selecting some number
of the population as a basis, and apportioning accordingly.   I think that is fair;
I think that is just, and it seems to me that is the only method of which justice
can be done to those counties that have a large population. I offer these sug-
gestions because I think they indicate the fairest scheme for apportionment."
(Wyandotte, pp. 359, 360.)  (Emphasis supplied.)

Mr. Griffith replied:

"Mr. President, *it is no more than justice to organized counties that we give
them each a representative.   Unless we adopt this amendment, we cannot.   It
is known that every county has its own peculiar interests to care for; and when
one man represents two, three or four counties, he will not represent them all
so perfectly.*   The western counties are rapidly filling up, and if a county should

have now but 250 inhabitants, they may have three times that number before election. I think it no more than fair to allow each organized county one representative." (Wyandotte, p. 360.) (Emphasis supplied.)

Mr. Stinson, of Leavenworth County, stated:

"Mr. President, I think the argument which the gentleman has adduced applies with no greater force to the sparsely settled counties of our western border than to those on our eastern border. . . . *It is not square miles and acres that are to be represented, but people;* and although there may be hundreds of square miles with nothing on the land, it does not work injustice if these square miles are not represented. I shall vote against the amendment." (Wyandotte, p. 360.) (Emphasis supplied.)

Mr. Thacher, a delegate from Douglas County, replied:

"Mr. President, *I think every organized county has district interests that require a representative at least in one branch of the Legislature. . . .* Where you attach two or more counties together you necessarily have to take your representative from one or the other county, and so the interests of one or two counties are completely left in abeyance. . . . In other words, if you do not give each county a representative, you sweep it out without any representative at all. Where a representative represents two counties, he in fact only represents one. . . . I believe the amendment is a wise and salutary provision, and one which should be adopted. Every organized county ought to have a representative, and if you don't give it one, you disfranchise it." (Wyandotte, p. 360.) (Emphasis supplied.)

Mr. Griffith's amendment was adopted by a vote of 30 to 18, and the report of the apportionment committee was ordered recommitted to the Committee on Apportionment for further consideration. (Wyandotte, p. 361.)

On Tuesday, July 26, 1859, the Committee on Apportionment again reported to the convention. (Wyandotte, p. 475.) The report was in three sections. Sections one and two read:

"SECTION 1. In the permanent apportionment of the State, each organized county shall have at least one Representative; and each county shall be divided into as many Districts as it has Representatives.

"SEC. 2. It shall be the duty of the first Legislature to make a permanent apportionment, based upon the census ordered by the last Legislative Assembly of the Territory; and a new Apportionment shall be made in the year 1866, and every five years thereafter, based upon the census of the preceding year." (Wyandotte, p. 475.)

Both sections are a part of the Constitution of Kansas and appear as Sections 1 and 2 of Article 10 relating to apportionment, with the exception of the word "permanent" in Section 1, which now reads "future," and the word "permanent" in Section 2 which has been deleted. Section 3 merely made temporary apportionment for both senators and representatives.

Mr. McDowell asked leave to submit a minority report of the Committee on Apportionment because he regarded the majority report as both partisan and unjust. The minority report read, in part:

"First; *we regard population as the only correct basis of an apportionment,* and therefore, without having before us an estimate or census of the population *we cannot agree with the majority of the committee in making acres and square miles a basis. . . .*" (Emphasis supplied.)

. . . . . . . . . . . . .

"Third; *still insisting upon population as the true basis of representation; and still satisfied that square miles should not be the basis of an apportionment,* we . . . submit . . . the following . . .*" (Wyandotte, p. 476.) (Emphasis supplied.)

On motion of Mr. McDowell, the convention took up the consideration of the report of the Committee on Apportionment. Mr. Graham moved its adoption. In addressing the convention, Mr. McDowell stated:

"I hope, sir, that the Convention will not adopt the majority report. . . . *I undertake to say that this report is a scheme gotten up for political purposes.* . . . I hope this will not be adopted, because it is unjust and unfair— because the committee have not proceeded upon any just basis. . . . *The only just way of proceeding is [to] ascertain the population; determine that such a ratio shall be entitled to a representative, and then [it] is nothing but a mere matter of arithmetic. . . .*" (Wyandotte, pp. 477, 478.) (Emphasis supplied.)

Following lengthy debate, the report of the Committee on Apportionment was adopted and Article 10, Sections 1 and 2 became a part of our Constitution.

On Friday, July 29, 1859, the final day of the convention, the Constitution was presented in final form for signing. Mr. Slough, of Leavenworth, addressed the chair, and after eulogizing the Constitution's general features, pronounced it "a model instrument." However, he formally announced that political objections impelled him and the members of his party to decline to sign the Constitution for its failure to submit to the people of Kansas the question of Negro exclusion, and for apportionment of both houses of the legislature on a population basis. (Wyandotte, pp. 566-571.)

The bill for Kansas' admission to the union was H. R. No. 23 (Act Jan. 29, 1861, Ch. 20, 12 Stat. 126), and it expressly declared that the government of Kansas was republican in form. (Art. IV, § 4.)

On April 11, 1860, the House of Representatives voted to admit Kansas as a new state under the Wyandotte Constitution. (Cong. Globe, 36th Cong. 1st Sess. Part 2, p. 1672 [hereafter cited Globe,

36th Cong.].) During the debates on the admission, Mr. Niblack stated that three points should be considered as imperative for the consideration of Congress on the application of a new state:

". . .1st, Has its constitution been formed in accordance with some law of the Territorial Legislature, or with an act of Congress authorizing a State organization? 2d. Is its constitution republican in form? 3d. Has the new State a sufficient population to assume the responsibilities of a State government, which Congress must determine by some fixed rule of law, or by the exercise of its discretion, from time to time, as the emergencies arise? . . . Tested by a fair application of this theory, I believe that Kansas has all the essential requisites for admission. . . ." Globe, 36th Cong., p. 1665.)

Twice during the next eight months, the Senate debated motions to consider the Kansas bill. During those debates, Mr. Collamer said:

"There is no objection to this constitution that it is not republican in form of its government. That is requisite by the United States Constitution. It guarantees to every State a republican form of government; and I take it, this constitution, thus adopted by the people of Kansas, is a republican form of government. . . ." (Globe, 36th Cong., p. 2463.)

On January 21, 1861, the bill passed the Senate, and eight days later, on January 29, 1861, Kansas was "added to the Stars." (Globe, 36th Cong., p. 489.)

Surely no one would contend that when Kansas was admitted to the union under a constitution found to be republican in form pursuant to Article IV, Section 4, that any provision in the Constitution of the United States restricted the exercise of its inherent right of sovereignty to regulate suffrage, except with respect to the election of Congressmen as provided for in Article 1, or to apportion the seats of its legislature pursuant to its constitutional provisions and statutory enactments. Moreover, if recorded history demonstrates any one irrebuttable fact, it is that the question of representation in the Kansas legislature was a political question of great magnitude which was continuously considered and bitterly debated by delegates at the convention, and the issue whether both houses of our bicameral legislature would be apportioned solely on the basis of population or whether one house would be apportioned on a geographical and population basis was resolved by the people when they voted overwhelmingly to give each organized county at least one representative in adopting the Constitution. It is no wonder that the people of this state find it incredible that they should now be told they must disregard the whole course of their political history, and,

in the name of "equality," as announced by the majority, eliminate that feature in our state governmental structure which was devised to protect the rights of the few from being sacrificed, while satisfying the needs of the many.

The Kansas apportionment plan has been the result of a conscientious state policy of providing representation for the people solely by population in the Senate and by geographical and population considerations in the House of Representatives. Its design was to provide a compromise between interests of the popular majority and the political, geographic and economic interests of the important minority, and to insure all citizens a ready access to the ear of their representative and an effective voice in the legislative chambers. This plan has made it possible for the majority to rule without tyrannizing, and for the minority to influence without ruling. For over 104 years this plan has worked to the best interests and satisfaction of all elements of the Kansas population and its wisdom or validity has never been previously challenged. In light of the state's topography, geography, history, heterogeneity and concentration of population, and the variety of social and economic interests, our apportionment plan reasonably achieves an effective and balanced representation of all substantial interests without sacrificing the principle of effective majority rule. The plan is a rational one and makes no unreasonable discrimination; it has been applied systematically and it has been kept reasonably current; it has not tended to lend itself to any frustration of the will of the majority of the electors of the state, and it is presently in full compliance with Article 2, Section 2, and Article 10, Sections 1 and 2 of the Kansas Constitution. (*Harris v. Shanahan*, supra, March 30, 1964.)

The obvious gist of *Reynolds* is that there was concealed within the historical phrasing of the Fourteenth Amendment, although unknown to Congress when it proposed and submitted the amendment, and to the states when they ratified it, the requirement that both houses of a state bicameral legislature be apportioned on a population basis, which has now arisen like a springing use, and only recently became "discoverable" by the majority for which "manageable" standards were prescribed through its inflated rhetoric and a tortured interpretation of decisions that are not the slightest degree in point. The inescapable effect of the majority's essay in arithmetical numbers and *residence* geography is to convert a particular political philosophy into a constitutional ruling that equal-populated

districts are an indispensable condition of state government which was withdrawn by the Fourteenth Amendment from encroachment by the states. Historical facts of the amendment and the experiences and traditions of our people and our law do not support this conclusion, nor is the majority authorized in the name of "interpretation" to construe that amendment or subsequent amendments or acts of Congress, to reach this result. The majority has cast aside our political history "regarding the relationship between population and legislative representation—a wholly different matter from denial of the franchise to individuals because of race, color, religion or sex." (*Baker v. Carr*, supra, Frankfurter, J., dissenting, p. 714.) Likewise, it has, in effect, determined that the government of the state of Kansas is no longer republican in form because its Constitution arbitrarily denies the right of equal "weighted" suffrage to a considerable number of people of the state, and that what was once the power of Congress to determine the republican character of state governments under Article IV, Section 4, as it did with respect to Kansas, has now been assumed by the majority through the imposition of a synthetic judicially created right which recognizes numbers as the only basis for representation.

I pause here to note that not all of the present majority have always entertained the idea that the right to protect against "dilution" of votes was within the judicial orbit, but that it should be left to congressional action. See dissenting opinion in *United States v. Saylor*, 322 U. S. 385, 88 L. Ed. 1341, 64 S. Ct. 1101. Likewise, Mr. Chief Justice Warren was not always of the view that bicameral legislatures were required to have equal populated districts. When he was governor of the state of California, a controversy arose with respect to the apportionment of the legislature of that state, and in a speech at Merced, California, on October 29, 1948, he said:

" 'Many California counties are far more important in the life of the State than their population bears to the entire population of the State. It is for this reason that I have never been in favor of restricting the representation in the senate to a strictly population basis.

" 'It is the same reason that the Founding Fathers of our country gave balanced representation to the States of the Union—equal representation in one house and proportionate representation based on population in the other.

" 'Moves have been made to upset the balanced representation in our State, even though it served us well and is strictly in accord with American tradition and the pattern of our National Government.

" 'There was a time when California was completely dominated by boss rule. The liberal election laws and legislative reapportionment of the system

have liberated us from such domination. Any weakening of the laws would invite a return to boss rule which we are now happily rid of.

"'Our State has made almost unbelievable progress under our present system of legislative representation. I believe we should keep it.'" (Congressional Record, July 2, 1964, 88th Congress, Second Session, p. 15328.)

See, also, Barclay, "The Reapportionment Struggle in California in 1948," The Western Political Quarterly, Vol. 4, June, 1951, p. 319.

If ever a legal opinion almost mathematically demonstrated an absolute certainty, it was Mr. Justice Harlan's devastating dissent to the majority opinion in *Reynolds*. If he can be answered, I surrender human reason as a vain and useless faculty, given to bewilder, and not to guide us. But what concerns me is that the majority should decide that case heedless of such a dissent, without having manifested that it paid the slightest attention to the absolutely convincing materials Mr. Justice Harlan assembled respecting historical facts of congressional intent in submitting the Fourteenth Amendment to the states for ratification. In considering the political complexities of state apportionment, is the recorded history of the submission and ratification of the amendment to be ignored or cast aside by the majority—like Caesar's notes and memorandum in the hands of Anthony—to be open to them only, and construed to say so much and no more, as suits their views? (See, for instance, *Wesberry v. Sanders*, supra, where the majority relied almost entirely upon historical facts to support its conclusion.) When the constitutional issue is simply what did or did not happen in the past; in what manner recorded history speaks, then no judicial opinion has either finality or infallibility. The truth of "historical assertions depends on facts and on facts alone, and those must be evidenced and established by actual documents, the same as any other facts in litigation no longer capable of proof by living witnesses." (Wiener, Uses and Abuses of Legal History: A Practitioner's View [1962], p. 26.)

No one questions the fact that the account of history of the *Fourteenth Amendment is not accurate and is not a safer guide* to common understanding and hence to constitutional meaning. Mr. Justice Holmes declared that fact, in speaking for a unanimous court in *Jackman v. Rosenbaum Co.*, 260 U. S. 22, 31 67 L. Ed. 107, 43 S. Ct. 9, when he said:

"The Fourteenth Amendment, itself a historical product, did not destroy history for the states and substitute mechanical compartments of law, all exactly alike. If a thing has been practiced for two hundred years by common

consent, it will need a strong case for the Fourteenth Amendment to affect it. . . ."

Neither does the Fourteenth Amendment restrain the states from experimentation in political ways and means which characterizes a viable government, nor restrict them in the manner of apportioning their legislatures, and, contrary, I think, to what Mr. Justice Brennan stated in an address to the Conference of Chief Justices on "Some Aspects of Federalism," in New York, August 7, 1964, it may not be used by the majority to declare in what areas "a uniform and national policy should obtain" to supersede state power. Mr. Justice Pitney declared otherwise in *Ownbey v. Morgan,* 256 U. S. 94, 112, 65 L. Ed. 837, 41 S. Ct. 433, 17 A. L. R. 873, when he said:

". . . it cannot rightly be said that the Fourteenth Amendment furnishes a universal and self-executing remedy. Its function is negative, not affirmative, and it carries no mandate for particular measures of reform. . . ."

Again, Mr. Justice Holmes cautioned in *Louisville & N. R. Co. v. Barber Asphalt Paving Co.,* 197 U. S. 430, 434, 49 L. Ed. 819, 25 S. Ct. 466, that "it is important . . . to avoid extracting from the very general language of the Fourteenth Amendment a system of delusive exactness." To the same effect is Mr. Justice Reed's statement in *Breard v. Alexandria,* 341 U. S. 622, 642, 95 L. Ed. 1233, 71 S. Ct. 920, that "the . . . Fourteenth Amendment has never been treated as absolute[s]."

An excellent analysis of the relevant historical materials of the origin, debates and submission of the Fourteenth Amendment was marshaled and set forth by Mr. Justice Harlan in his dissenting opinion in *Reynolds.* While I do not wish to be repetitious, I feel that this historical evidence should be made available to the people of this state so they may know that when Congress submitted and the legislature of Kansas ratified the Fourteenth Amendment neither Congress nor our legislature intended to change or alter the political structure or governmental organization of this state.

The Fourteenth Amendment is a single text containing five sections, and was proposed and discussed as such in the Reconstruction Committee. (62 Kendrick, The Journal of the Committee of Fifteen on Reconstruction, pp. 83-117.) It was discussed as a unit in Congress, and submitted to the states (Cong. Globe, 39th Cong., 1st Sess., pp. 2459-3149 [hereafter cited as Globe, 39th Cong.]), which ratified it as a unit. But the majority considered only the first section which provides that no state "shall deny to any person

within its jurisdiction the equal protection of the law," and ignored the significance of Section 2, which reads:

"Representatives shall be apportioned among the several States according to their respective numbers, counting the whole number of persons in each State, excluding Indians not taxed. *But when the right to vote at any election for* the choice of electors for President and Vice President of the United States, Representatives in Congress, *the Executive and Judicial officers of a State, or the members of the Legislature thereof, is denied* to any of the male inhabitants of such State, being twenty-one years of age, and citizens of the United States, *or in any way abridged,* except for participation in rebellion, or other crime, the basis of representation therein shall be reduced in the proportion which the number of such male citizens shall bear to the whole number of male citizens twenty-one years of age in such State." (Emphasis supplied.)

If there was no other evidence of congressional intent available to ascertain the meaning, the purposes and reaches of the Fourteenth Amendment, the express language of Section 2 completely refutes the majority's conclusion that federal power through the Equal Protection Clause extends into the states with respect to any element of the franchise. The states could deny or abridge a citizen's right to vote for the executive and judicial officers of a state, or the members of the legislature thereof; hence, it is inconceivable to me how the majority could conclude that vote "weighing" is impermissible under the Equal Protection Clause in an election for state representatives. I submit there is nothing—I repeat, nothing—in the express language of the amendment which authorizes or justifies such a conclusion.

But one need not rely alone upon the clear and express language of the amendment to show conclusively that those who proposed and ratified the amendment had any reason to believe that the Equal Protection Clause withdrew from the states the power to apportion their legislative bodies. The history of The Joint Committee of Fifteen on Reconstruction is recorded and documented by Kendrick, and the resolution incorporating the amendment was reported to Congress on April 30, 1866. (Globe, 39th Cong., p. 2286.)

On May 8, Thaddeus Stevens opened the debate in the House of Representatives. The epitome of his remarks was that the proposition was not all the committee desired, and he stated:

"I believe it is all that can be obtained in the present state of public opinion. Not only Congress but the several states are to be consulted. Upon a careful survey of the whole ground, we did not believe that nineteen of the loyal States could be induced to ratify any proposition more stringent than this." (Globe, 39th Cong., p. 2459.)

He reminded the house,

". . . that three months since, and more, the committee reported and the House adopted a proposed amendment fixing the basis of representation in such way as would surely have secured the enfranchisement of every citizen at no distant period. . . ." (*Ibid.*)

But the proposal was rejected in the Senate. (See House Resolution No. 51, hereafter referred to.) In discussing the first section of the proposed amendment, and particularly the Equal Protection Clause, he said that it would allow Congress to correct any unjust legislation of the states so that whatever law punishes or protects one man shall operate *equally* upon all.

Turning to the second section, which Mr. Stevens considered the most important in the article, he said that while its effect was to fix the basis of representation of Congress, it also recognized the power of a state to withhold the right to vote:

". . . If any State shall exclude any of her adult male citizens from the elective franchise, or abridge that right, she shall forfeit her right to representation in the same proportion. The effect of this provision will be either to compel the States to grant universal suffrage or so to shear them of their power as to keep them forever in a hopeless minority in the national Government, both legislative and executive." (*Ibid.*)

He indicated his dislike for second section for the reason:

". . . This section allows the States to discriminate [with respect to the right to vote] among the same class, and receive proportionate credit in representation." (Globe, 39th Cong., p. 2460.)

Mr. Broomall, of Pennsylvania, stated that while the amendment did not contain everything he wanted, he would vote for it because it was the best he could get, and that:

"It is known to every gentleman in this hall . . . we leave it to these States to grant or refuse suffrage, without regard to the condition, the opinions, or the crimes of those claiming it. . . ." (Globe, 39th Cong., p. 2499.)

Mr. Miller, of Pennsylvania, in discussing the second section, stated that he deemed it the most important of the amendment because:

". . . *This amendment will settle the complications in regard to suffrage and representation, leaving each State to regulate that for itself*, so that it will be for it to decide whether or not it shall have a representation of all its male citizens not less than twenty-one years of age." (Globe, 39th Cong., p. 2510.) (Emphasis supplied.)

Mr. Farnsworth, of Illinois, in discussing the question of apportionment of representatives in Congress, stated that Section 2 was

better than the one the House adopted previously. In concluding his remarks, he stated:

". . . This is a step in the right direction; and although I should prefer to see incorporated into the Constitution a guarantee of universal suffrage, *as we cannot get the required two thirds for that, I cordially support this proposition as the next best.*" (Globe, 39th Cong., p. 2540.) (Emphasis supplied.)

Mr. Bingham, of Ohio, was a member of the Reconstruction Committee and was the author of the first section of the amendment and its leading proponent. (Kendrick, *supra*, pp. 87, 106.) Speaking generally of the elective franchise, he said:

". . . To be sure we all agree, and the great body of the people of this country agree, and the committee thus far in reporting measures of reconstruction agree, that *the exercise of the elective franchise, though it be one of the privileges of a citizen of the Republic, is exclusively under the control of the States.* . . ." (Globe, 39th Cong., p. 2542.) (Emphasis supplied.)

With respect to the first section of the amendment, he said:

"Allow me, Mr. Speaker, in passing, to say that this amendment takes from no State any right that ever pertained to it. No State ever had the right, under the forms of law or otherwise, to deny to any freeman the equal protection of the laws or to abridge the privileges or immunities of any citizen of the Republic, although many of them have assumed and exercised the power, and that without remedy. *The amendment does not give, as the second section shows, the power to Congress of regulating suffrage in the several States.*

"*The second section excludes the conclusion that by the first section suffrage is subjected to congressional law;* save, indeed, with this exception, that as the right in the people of each State to a republican government and to choose their Representatives in Congress is of the guarantees of the Constitution, by this amendment a remedy might be given directly for a case supposed by Madison, where treason might change a State government from a republican to a despotic government, and thereby deny suffrage to the people. . . ." (*Ibid.*) (Emphasis supplied.)

During the three days of debate in the House, every speaker on the resolution, with one doubtful exception (Representative Rogers, of New Jersey, who voted against the resolution, suggested that the right to vote might be covered by the Privileges and Immunities Clause. [Globe, 39th Cong., pp. 2538, 2545.] But immediately thereafter he discussed the possibility that the southern States might "refuse to allow the negroes to vote."), assumed without question that suffrage was not a subject of congressional power. This assumption was not inadvertent and the speakers repeatedly stated, in express terms or by unmistakable implications, that the states were to retain the power over the elective franchise within their

borders. On May 10, the House passed the amendment as it had been reported by the committee.

The resolution was not considered in the Senate until May 23. Senator Howard, of Michigan, who was also a member of the Reconstruction Committee, opened the debate in the Senate with a lengthy discussion on Section 1 of the amendment, and explained the meaning of the Equal Protection Clause as follows:

"The last two clauses of the first section of the amendment disable a State from depriving not merely a citizen of the United States, but any person, whoever he may be, of life, liberty, or property without due process of law, or from denying to him the equal protection of the laws of the State. This abolishes all class legislation in the States and does away with the injustice of subjecting one caste of persons to a code not applicable to another. It prohibits the hanging of a black man for a crime for which the white man is not to be hanged. It protects the black man in his fundamental rights as a citizen with the same shield which it throws over the white man. Is it not time, Mr. President, that we extend to the black man, I had almost called it the poor privilege of the equal protection of the law? . . . .

"*But, sir, the first section of the proposed amendment does not give to either of these classes the right of voting. The right of suffrage is not, in law, one of the privileges or immunities thus secured by the Constitution.* It is merely the creature of law. It has always been regarded in this country as the result of positive local law, not regarded as one of those fundamental rights lying at the basis of all society and without which a people cannot exist except as slaves, subject to a depotism [*sic*]." (Globe, 39th Cong., p. 2766.) (Emphasis supplied.)

In discussing the second section of the amendment, Mr. Howard admitted that it was not all that he desired, thinking that suffrage should be secured to some extent at least to the Negroes. According to him, the question of suffrage was left with the states under the second section, and he expressed his regret that it did "not recognize the authority of the United States over the question of suffrage in the several States." (Globe, 39th Cong., p. 2766.) However, in this regard he justified the limited purpose of the amendment as follows:

"But, sir, it is not the question here what will we do; it is not the question what you, or I, or half a dozen other members of the Senate may prefer in respect to . . . suffrage; *it is not entirely the question what measure we can pass through the two Houses; but the question really is, what will the Legislatures of the various States to whom these amendments are to be submitted do in the premises;* what is it likely will meet the general approbation of the people who are to elect the Legislatures, three fourths of whom must ratify our propositions before they have the force of constitutional provisions?

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"*The committee were of opinion that the States are not yet prepared to sanction so fundamental a change as would be the concession of the right of*

*suffrage.* . . . We may as well state it plainly and fairly, so that there shall be no misunderstanding on the subject. *It was our opinion that three fourths of the States of this Union could not be induced to vote to grant the right of suffrage, even in any degree or under any restriction* . . .

"*The second section leaves the right to regulate the elective franchise still with the States, and does not meddle with that right.*" (*Ibid.*) (Emphasis supplied.)

In the Senate several changes were made in the first and second sections of the amendment, and more attention was given to the question of suffrage rights than had been given in the House. However, in the Senate as in the House, it was equally understood that the first and the second sections of the amendment did not interfere with the power of the states to regulate suffrage rights. That the states were to retain the power of regulating suffrage after the adoption of the amendment was emphatically expressed by Senator Howard on June 8, as follows:

". . . *We know very well that the States retain the power, which they have always possessed of regulating the right of suffrage in the States. It is the theory of the Constitution itself. That right has never been taken from them; no endeavor has ever been made to take it from them; and the theory of this whole amendment is, to leave the power of regulating the suffrage with the people or Legislatures of the States, and not to assume to regulate it by any clause of the Constitution of the United States.*" (Globe, 39th Cong., p. 3039.) (Emphasis supplied.)

That same day Senator Johnson, of Maryland, in explaining the meaning of the second section of the amendment, commented as follows:

". . . It says to the States, 'If you exclude any class from the right to vote, we, *admitting your power to make the exclusion,* say it shall have no other effect whatever than to deduct the number excluded from the whole number which is to constitute the basis of representation. If, therefore, you exclude from the benefit of the franchise any who are citizens of the United States, and twenty-one years or more of age, and inhabitants of the State, who belong to any particular race, or who are of any color contradistinguished from the white man, *we admit that you have a right to exclude them, and all we propose to do is to say that to the extent of that exclusion your basis of representation shall be diminished.*'" (Globe, 39th Cong., p. 3028.) (Emphasis supplied.)

In debate on House Resolution No. 51, Senator Johnson said:

". . . But nobody dreams of interfering with the right of the States to regulate suffrage with reference to their own officers, or of interfering with the right of the States to appoint their own officers, or to elect their own officers, and to prescribe the qualifications which the electors of their own officers are to have. *Nobody has ever dreamed that this Government was to step within the limits of State lines and tell the States how their Legislatures shall be elected,*

*how their officers shall be chosen. . . ."* (Globe, 39th Cong., p. 765.) (Emphasis supplied.)

On June 8, 1866, the Senate passed the resolution which contained the Fourteenth Amendment in its present form. Five days later Thaddeus Stevens arose in the House and moved to concur in the Senate amendments. The vote was favorable, and the Fourteenth Amendment was submitted to the states for ratification on June 16, 1866.

Kansas ratified the amendment without delay. On January 9, 1867, Governor Crawford transmitted the proposed amendment to the legislature in his annual message. He requested that both houses give it their unanimous approval. It is significant that in the same message he asked the legislature to submit a constitutional amendment to a vote of the people at the next general election, striking the word "white" from our Constitution, which limited the voting rights to the white race. (House Journal, 1867 Sess., p. 65.) The governor's request is an express indication that at the time the legislature was considering ratification of the Fourteenth Amendment it was assumed that after ratification of the amendment, Kansas would retain the power to regulate suffrage in all respects within its borders.

On the following day, House Joint Resolution No. 1 to ratify the Fourteenth Amendment was introduced in the House of Representatives and passed that body by a vote of 76 to 7. (House Journal, 1867 Sess., pp. 73-79.) It should be noted that the members of the House of Representatives were elected from districts apportioned by the legislature pursuant to Article 10, Section 1, giving to each organized county at least one representative. On January 11, the Senate voted to adopt the resolution by a vote of 23 to 0. (Senate Journal, 1867 Sess., p. 76.) On January 19, Governor Crawford informed the house that he had approved Joint Resolution No. 1 ratifying the Fourteenth Amendment and had transmitted the same to the secretary of state of the United States. (House Journal, 1867 Sess., p. 186.)

While no record was made of the debates on the ratification of the Fourteenth Amendment, I cannot import to the Kansas legislature such crass foolishness that by ratifying the amendment it impliedly eliminated the apportionment provisions of the Constitution under which it was elected and then assembled for purposes of ratifying the amendment, now used by the majority in *Reynolds*

as the pruning shears. If there was any doubt about the question, it was completely dispelled in 1873 when the people of this state voted to amend Article 2, Section 2 of our Constitution by increasing the number of Representatives from 100 to not to exceed 125, and the number of Senators from 33 to not to exceed, 40, and affirmatively wrote into that section for the first time the requirement that the House of Representatives shall admit one member from each county in which at least 250 votes were cast at the next preceding general election. That is conclusive evidence our people did not understand or intend the Fourteenth Amendment to eliminate the geographical apportionment provisions of that Article or of Section 1 of Article 10.

Within a year from the time the Fourteenth Amendment was submitted to the states, 22 had ratified it, being more than three-fourths of the so-called "loyal states." It was promptly rejected by all the southern states, with the exception of Tennessee, and this was enough to defeat ratification inasmuch as the ten southern states were more than one-fourth of the 37 states in the union at that time. In the spring of 1868, Iowa ratified, but by then nearly two years had passed from the time the amendment was submitted and the assent of the necessary three-fourths was still lacking. During this period, Kentucky, Delaware and Maryland rejected the amendment, and Ohio, New Jersey and Oregon rescinded their former ratification although Congress later repudiated their rescission. (Flack, The Adoption of the Fourteenth Amendment, pp. 189, 190.) The radical members of the so-called "Union Party" were stymied; the congressional plan of reconstruction (Kendrick, *supra*, p. 319) still lacked approval. It was necessary that 28 states ratify and only 23 had thus far approved. To secure ratification, Congress passed the Act of June 25, 1868, to "readmit" some of the southern states. The bill (H. R. No. 1058) was introduced in the House and passed that body. (Globe, 40th Cong., pp. 2412-2465.) It was amended in the Senate to include Florida, and read, in part:

"*Be it enacted, &c.,* That each of the States of North Carolina, South Carolina, Louisiana, Georgia, Alabama and Florida shall be entitled and admitted to representation in Congress as a State of the Union *when* the Legislature of such State shall have duly ratified the amendment to the Constitution of the United States proposed by the Thirty-Ninth Congress, and known as article fourteen, upon the following fundamental conditions." (Globe, 40th Cong., 2nd Sess., p. 3090 [hereafter cited Globe, 40th Cong.].) (Emphasis supplied.)

That the express purpose of the Act was to coerce these states

into ratifying the Fourteenth Amendment was emphatically pronounced by Senator Saulsbury, of Delaware, during the debates, as follows:

"Then I hold you to this, gentlemen; you mean to say that notwithstanding they are States in the Union you will not allow them a constitutional right to representation in this body unless they ratify what you propose to them. You mean to say to the American people, and that is the doctrine in your bill, *True, you are States in the Union, but you shall have none of the benefits of the Union; you shall have no voice in the legislation of the country unless for the sake of having that benefit you shall do our bidding by adopting the proposed constitutional amendment, which you would not adopt if left to your own free will and choice.*" (Globe, 40th Cong., p. 2927.) (Emphasis supplied.)

In the debate in the House to concur in the Senate amendment, Mr. Bingham, of Ohio, confirmed that purpose of the Act when he said:

". . . The condition-precedent incorporated in this bill, which now presses for decision before this House, is that not one of the six States named in it shall come to political power *save upon the condition that its Legislature shall in due form ratify the fourteenth article of amendment.* (Globe, 40th Cong., p. 3094.) (Emphasis supplied.)

In reply, Mr. Brooks, of New York, stated:

"Ah . . . the gentleman has consulted his arithmetic, his addition and subtraction, and by the process of two of the great rules of arithmetic he has come to the conclusion that unless Florida be included in this omnibus bill the proposed fourteenth article of the amendments of the Constitution cannot be carried; that it is necessary, in order to carry that amendment, to include Florida in this bill, and to admit her with these other States. That is the idea which the gentleman avows. . . . in order to change the Constitution of the country, it is necessary, according to his arithmetic, no matter what may be the constitution of Florida, no matter whether the State may be rebellious or anti-rebellious, to overlook and override all other considerations and to admit the State for that object, if not for that object alone . . ." (Globe, 40th Cong., p. 3095.)

During the debate, the problem of state legislative apportionment was expressly called to the attention of Congress. Florida's constitution provided that each county in the state would be entitled to a representative. Because of this provision, and for certain political reasons, Mr. Farnsworth objected to the inclusion of Florida in the Act, and said:

"I might refer to the *apportionment of representatives. By this constitution representatives in the Legislature of Florida are apportioned in such a manner as to give to the sparsely-populated portions of the State the control of the Legislature.* The sparsely-populated parts of the State are those where there are very few negroes, the parts inhabited by the white rebels, the men who, coming in from Georgia, Alabama, and other States, control the fortunes of

their several counties. *By this constitution every county in that State is entitled to a representative.* There are in that State counties that have not thirty registered voters; yet, under this constitution, every one of those counties is entitled to a representative in the Legislature; while the populous counties are entitled to only one representative each, with an additional representative for every thousand inhabitants." (Globe, 40th Cong., p. 3090.) (Emphasis supplied.)

Mr. Butler, of Massachusetts, responded to Mr. Farnsworth's objection, as follows:

"All these arguments, all these statements, all the provisions of this constitution have been submitted to the Judiciary Committee of the Senate, and they have found the constitution republican and proper. This constitution has been submitted to the Senate, and they have found it republican and proper. It has been submitted to your own Committee on Reconstruction, and they have found it republican and proper, and have reported it to this House." (*Ibid.*)

Mr. Bingham also considered the constitution of Florida to be republican in form, and said:

". . . The constitution, sir, is democratic by all the traditions of the Republic. It is republican by all the interpretations of the Constitution of the United States." (Globe, 40th Cong., p. 3094.)

Mr. Farnsworth's motion to amend the Act by striking out Florida was overwhelmingly rejected. (Globe, 40th Cong., p. 3097.)

Irrespective of the true purpose of the Act of June 25, immediate action was taken by the six states named in the Act and all ratified the Fourteenth Amendment, making possible the final proclamation issued on July 28, 1868, declaring it a part of the Constitution.

It seems incredible to me that the majority could declare in *Reynolds* that "congressional approval, however well-considered, could hardly validate an unconstitutional state legislative apportionment" (p. 589), in the face of all this historical evidence—when the authors of the Fourteenth Amendment, as well as both houses of Congress, had thoroughly scrutinized the constitutions of the six southern states to determine whether they were republican in form and in compliance with the amendment—when Congress was so solicitous and demanding of its adoption—when these states were admitted for the very purpose of securing ratification, and without their favorable vote ratification would have failed—when the apportionment provisions of the Constitution of Florida expressly provided that each county would be apportioned at least one representative on a geographical basis, regardless of population, and when at the very moment and by the very act of ratification, these states, according to the majority, instantaneously

struck down *sub silentio* all apportionment provisions of their constitutions not making mere numbers the basis for representation in their state legislatures. I cannot impute to the members of the 40th Congress such lack of integrity or such reckless disregard of duty as to readmit states having constitutional provisions repugnant to the Fourteenth Amendment for the very purpose of insuring its ratification. Note, however, the Kansas Constitution stands in a different posture than did the constitutions of the six southern states, because Kansas was admitted to the union prior to the adoption of the Fourteenth Amendment, and no one would contend that it did not have full power with respect to establishing voting rights of its citizens except as provided in Article 1, Section 2, or for determining the manner of apportionment of its legislature.

I ask, would a single state of the union have agreed to ratification of the Fourteenth Amendment had it expressly given all the power to the federal judiciary now proclaimed by the majority opinion? Is there any reason to believe the states are more disposed now than then to acquiesce in this coercive supersession of their rights and powers by judicial fiat to a consolidated government, and to have substituted in their political systems voter-power for voter-representation to influence legislative action? The history and intent of submission together with the practical historical consideration of our federal system demonstrates devastatingly otherwise. I have no hesitancy in saying that had there been the least anticipation of the course of decision in *Reynolds,* there would have arisen a solid phalanx of opposition. The states would not have adopted it. They would have stood upon the constitution their founders gave them. They would have steadfastly claimed that they had the right to regulate suffrage within their own confines and to apportion their legislatures in the manner prescribed by their constitutions.

Be that as it may, .the foregoing historical facts show beyond· any doubt: (1) That Congress, as well as members of the Reconstruction Committee who proposed the Fourteenth Amendment—although fully aware of the possibility that some of the states would deny or abridge the voting rights to all or a part of their citizens—refrained from incorporating in its provisions universal suffrage in derogation of the states' power to regulate the elective franchise; instead, it was the intent of Congress to coerce the states into conferring voting rights upon all their citizens by the indirect means of reducing the states' representation in the House of Representatives in the manner and in the ratio provided in Section 2, thereby

insulating from federal power, the right of any state to permit, deny or abridge the right of suffrage under such qualifications as it might prescribe. (2) That the sponsors of the Fourteenth Amendment did not have the votes in the Reconstruction Committee to place restrictions on the states' power to control voting rights (62 Kendrick, *supra*, pp. 300-303) or in the Congress to submit the amendment incorporating that objective, nor did Congress believe that if such restrictions were imposed, the states would ratify it. (3) That at least a substantial majority of the states, and Kansas in particular, did not understand or intend that by ratifying the Fourteenth Amendment they were accepting limitations to regulate voting rights in any manner they might choose, particularly with respect to vote "weighing" based upon *residence* geography.

By the deliberate choice of the sponsors of the amendment and of the Congress which submitted it, the very problems passed upon by the majority in *Reynolds*—the control of voting rights for members of the state legislature—was insulated against the exercise of federal power, and no amendment or act of Congress has subsequently conferred federal power to restrict that right or to dictate the manner of state apportionment.

At this juncture, I turn to the majority's new "constitutional" doctrine. By its rigid pronouncement that "the Equal Protection Clause requires that the seats in both houses of a bicameral legislature must be apportioned on a population basis" (p. 531), the majority has engaged "in a species of absolutism in its reasoning, which is more likely to lead us into darkness than to light." (Griswold, Absolute Is in the Dark, 8 Utah L. Rev. 167, 168 [1963].) To reach that conclusion the majority had to find: (1) an individual and personal right which was protected by the federal constitution and which demanded judicial protection, and it purported to do this when it concluded that "the right to vote is personal" and that "the right to suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise" (pp. 523, 524); (2) that "invidious discrimination" results when the weight of a citizen's vote for a state legislator "is in a substantial fashion diluted when compared with votes of citizens living in other parts of the state" (p. 531), and (3) "discoverable" and "manageable" standards in the Equal Protection Clause by which to measure state apportionment plans, and it did this when it concluded that "the fundamental

principle of representative government in this country is one of equal representation for equal numbers of people, without regard to race, sex, *economic status*, or *place of residence* within a state." (p. 526.) (Emphasis supplied.) I think it has been unanswerably demonstrated that this is not correct as a matter of fact. (*Baker v. Carr*, supra, Frankfurter, Jr., dissenting, heretofore quoted, p. 735.)

The majority accepts the idea that geographical districting is constitutionally permissible, but what is impermissible, it asserts, is geographical *residence*, since such a consideration would not permit equally "weighted" voting. It does not suggest how or why geographical *residence* "dilutes" or "debases" votes, or how or why the residence of a voter in Morton County, for instance, makes him that much more or that much less a citizen of the United States or the state of Kansas than a voter who resides in Doniphan County, or where in the Constitution there is prescribed a limitation upon the relative weight to which the law might properly entitle respective ballots for state representatives. Certainly, no scale to "weigh" votes may be found in either the Fourteenth, Fifteenth, Nineteenth or Twenty-Fourth Amendments. As Mr. Justice Clark stated: "No one . . . contends that mathematical equality among voters is required by the Equal Protection Clause." (*Baker v. Carr*, supra, concurring, p. 709.)

The majority uses the Equal Protection Clause as the formal vehicle for condemning state apportionment plans that do not satisfy the population standard. Its conclusion is that an apportionment plan which does not afford equal representation to voters results in a *discriminatory denial of the right to vote*. Thus, the right to vote emerges as the critical question. (Kauper, Reapportionment symposium, 63 Mich. L. Rev. 243, p. 249 [1964].) This raises the question, what is the constitutional source of the right to vote?

The right of suffrage is a political right. The Constitution of the United States does not confer that right upon anyone, and the United States has no voters of its own creation in the states (*Minor v. Happersett*, 88 U. S. 162, 22 L. Ed 627; *United States v. Cruikshank et al.*, 92 U. S. 542, 23 L. Ed. 588; *Pope v. Williams*, 193 U. S. 621, 48 L. Ed. 817, 24 S. Ct. 573; *Guinn v. United States*, 238 U. S. 347, 59 L. Ed. 1340, 35 S. Ct. 926, L. R. A. 1916A 1124), except insofar as the Constitution expressly provides that the members of the House of Representatives (Art. 1, § 2) and of the Senate

(Seventeenth Amendments) shall be elected in each state by electors having the qualifications requisite for electors for the most numerous branch of the state legislature. The right to vote for members of Congress is a *federal right* secured by the *Constitution,* and a state in prescribing the qualifications of voters for its legislature, does not do this with reference to the election of members of Congress. A state defines who is to vote for the members of its legislature, and the Constitution declares the same person shall vote for members of Congress in that state. It adopts the qualifications thus furnished by the state as the qualifications of its own electors for members of Congress. Hence, electors of members of Congress do not owe their right to vote to state law in any sense which makes the exercise of the right to depend exclusively on the law of the state. (*Ex parte Yarbrough,* 110 U. S. 651, 28 L. Ed. 274 4 S. Ct. 152; *United States v. Classic,* 313 U. S. 299, 85 L. Ed. 1368, 61 S. Ct. 1031; *United States v. Mosley,* 238 U. S. 383, 59 L. Ed. 1355, 35 S. Ct. 904; *United States v. Saylor,* supra.)

Under Article 1, Sections 4 and 8, Clause 18, Congress has the constitutional power to enact laws *for the protection of the right to vote for members of Congress.* (*Ex parte Yarbrough,* supra; *United States v. Classic,* supra.) It has enacted legislation for that purpose making it an offense to conspire to injure, oppress, threaten or intimidate, a citizen in the exercise of his constitutional rights, and also to deprive, under color of any law, an inhabitant of a state *of any rights protected* by the Constitution and laws of the United States. (18 U. S. C. A. §§ 241, 242.)

*Ex parte Yarbrough,* supra, was a habeas corpus proceeding in which the court sustained the validity of a conviction of the defendants who were charged with violating federal statutes making it a crime to conspire to deprive a citizen of his *federal rights,* and in particular, to deny his *right to vote.* The issue was whether Congress had power to pass laws protecting the right to vote for a member of Congress from fraud or violence. The defendants asserted that the right to vote for a member of Congress did not depend upon the Constitution or laws of the United States, but was governed by the law of each state. The Court relied on Article 1, Section 2, and held that *the right to vote for members of Congress* was fundamentally based upon the Constitution and was not intended to be left within the exclusive control of the states.

In *United States v. Classic,* supra, the defendants, Commissioners

of Election in Louisiana, were charged in indictments based upon Sections 19 and 20 of the federal criminal code (18 U. S. C. A., §§ 241, 242), with altering and miscounting ballots *in a congressional primary for a United States Representative.* It was held that party primaries are a part of the states' electoral process for the purpose of electing members of the House of Representatives, and that the right of qualified voters within a state to cast their ballots and have them counted at a congressional election *is a federal right secured by the Constitution* (Art. 1, § 2), but unlike the rights guaranteed by the Fourteenth, Fifteenth or Nineteenth Amendments, the right to choose members of Congress is secured against interference by private individuals, as well as against interference by action of the states. (*Ex parte Yarbrough,* supra; *Logan v. United States,* 144 U. S. 263, 36 L. Ed. 429, 12 S. Ct. 617.)

The defendants in *United States v. Mosley,* supra, were county election officials who were charged with conspiring to deprive citizens of their votes *for a member of Congress* by falsifying the election returns. The prosecution was brought under Section 19 of the criminal code. (18 U. S. C. A., § 241.) It was held that the statute constitutionality extends protection to the *right to vote for the members of Congress* and "that the right to have one's vote counted is as open to protection by Congress as the right to put a ballot in a box." (*United States v. Mosley,* supra, p. 386.)

In *United States v. Saylor,* supra, the defendants, county election officials, were charged with a violation of Section 19 of the criminal code (18 U. S. C. A., § 241) of conspiring to deprive citizens of the right to have their votes counted for *United States senator.* The indictment alleged that they "stuffed the ballot box" in favor of the opposing candidate for whom the injured voters had voted, thereby diluting and destroying the ballots of the injured voters. It was held that the provisions of Section 19 embraces a conspiracy by election officers to stuff a ballot box thereby causing ballots not to receive the weight which the law has in fact given them, and amounts to a deprivation of a Constitutional right *to vote for federal officers.*

The foregoing cases were cited by the majority to support its broad statements that "it has been repeatedly recognized that all qualified electors have a constitutionally protected right to vote" and to have "their votes counted"; that the right to vote cannot be "denied outright," nor "destroyed by alteration of ballots," nor "di-

luted by ballot-box stuffing." (p. 523.) The decisions are applicable insofar as they apply to federal statutes making it a crime to conspire to deprive a citizen of his *federal rights in a federal election,* and in particular the *right to vote* for members of Congress which *is secured by the Constitution.* But they are not in point on the present issue, that is, the right to freely vote for state representatives in a state election. Used in this context, none of those decisions have the slightest bearing on the question presented.

The right to vote in a state election is not conferred by the federal constitution, nor by any of its amendments. It is not a privilege springing from citizenship of the United States. (*Minor v. Happersett,* supra; *United States v. Cruikshank et al,* supra, p. 555; *Pope v. Williams,* supra; *Guinn v. United States,* supra.) The right to vote for state or local officers, or on purely state matters, is derived from the state constitution and laws and *is not a federal right* in the same way as is the right to vote for congressmen and senators. A state is free to define its qualifications for voting in a state election, except that it may not *deny* or *abridge* a citizen's right to vote on account of race, color, sex or poll tax extraction. (Fifteenth, Nineteenth, Twenty-fourth Amendments; *Pope v. Williams,* supra; *Breedlove v. Suttles,* 302 U. S. 277, 82 L. Ed. 252, 58 S. Ct. 205; *McPherson v. Blacker,* 146 U. S. 1, 38, 39, 36 L. Ed. 869, 13 S. Ct. 3.) In *Breedlove* Mr. Justice Butler, speaking for the court, stated:

". . . *Privilege of voting is not derived from the United States, but is conferred by the State and, save as restrained by the Fifteenth and Nineteenth Amendments* and other provisions of the Federal Constitution, *the State may condition suffrage as it deems appropriate. Minor v. Happersett,* 21 Wall. 162, 170 *et seq. Ex parte Yarbrough,* 110 U. S. 651, 664-665. *McPherson v. Blacker,* 146 U. S. 1, 37-38. *Guinn v. United States,* 238 U. S. 347, 362. . . ." (p. 283.) (Emphasis supplied.)

As heretofore pointed out, the Fourteenth Amendment did not confer the right to vote upon anyone. (*McPherson v. Blacker,* supra.) It was contended in *Minor v. Happersett,* supra, that the right of women to vote was protected by the Privileges and Immunities Clause of the Fourteenth Amendment, thus bringing the right to vote under the protection of the Constitution. The contention was rejected upon the ground that the right to vote was a privilege of state, not of national citizenship, and was not, therefore, among the privileges guaranteed by the Fourteenth Amendment. The Court held that neither the Constitution nor the Fourteenth

Amendment made all citizens voters (Syl. ¶ 5), and Mr. Chief Justice Waite indicated the Court's reasoning when he said:

"The amendment did not add to the privileges and immunities of a citizen. It simply furnished an additional guaranty for the protection of such as he already had. *No new voters were necessarily made by it.* . . ." (p. 171.) (Emphasis supplied.)

The following indicates the significance the court attached to the Fifteenth Amendment and its reasoning is applicable to the Nineteenth Amendment and the Twenty-fourth as well:

"And still again, after the adoption of the fourteenth amendment, it was deemed necessary to adopt a fifteenth. . . . The fourteenth amendment had already provided that no state should make or enforce any law which should abridge the privileges or immunities of citizens of the United States. If suffrage was one of those privileges or immunities, why amend the Constitution to prevent its being denied on account of race, &.c.? Nothing is more evident than that the greater must include the less, and if all were already protected why go through with the form of amending the Constitution to protect a part?" (p. 175.)

The Fifteenth Amendment places direct restrictions on the states' power of prescribing voting qualifications. Section 1 reads:

"The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color or previous condition of servitude."

The operation and effect of the Fifteenth Amendment was considered in *Guinn v. United States,* supra, and Mr. Chief Justice White, speaking for the court, said:

"(a) Beyond doubt the Amendment does not take away from the state governments in a general sense the power over suffrage which has belonged to those governments from the beginning, and without the possession of which power the whole fabric upon which the division of state and national authority under the Constitution and the organization of both governments rest would be without support, and both the authority of the nation and the state would fall to the ground. In fact, the very command of the Amendment recognizes the possession of the general power by the State, since the Amendment seeks to regulate its exercise as to the particular subject with which it deals.

"(b) But it is equally beyond the possibility of question that the Amendment in express terms restricts the power of the United States or the States to abridge or deny the right of a citizen of the United States to vote on account of race, color, or previous condition of servitude. The restriction is coincident with the power and prevents its exertion in disregard of the command of the Amendment. But while this is true, it is true also that the Amendment does not change, modify, or deprive the States of their full power as to suffrage except, of course, as to the subject with which the Amendment deals and to extent that obedience to its command is necessary. Thus the authority over

suffrage which the States possess and the limitation which the Amendment imposes are coordinate and one may not destroy the other without bringing about the destruction of both." (p. 362.)

The Nineteenth Amendment, which prohibits the United States or any state from denying or abridging the right of any citizen to vote on account of sex, like the Fifteenth Amendment, does not confer the right of suffrage upon anyone, although it has long been recognized that in operation their prohibitions might measureably have that effect; that is, that since the commands of the amendments are self-executing and reach without legislative action the conditions of discrimination against which they are aimed—for instance, the words "white" and "male" in state constitutions were automatically eliminated, thus increasing the number of citizens entitled to suffrage under the constitutions and laws of the states. (*Ex parte Yarbrough,* supra; *Neal v. Delaware,* 103 U. S. 370, 26 L. Ed. 567.) The amendments do not apply *to interference by private individuals* but only operate against *interference by action of the states.* (*Guinn v. United States,* supra; *Pope v. Williams,* supra; *James v. Bowman,* 190 U. S. 127, 47 L. Ed. 979, 23 S. Ct. 678; *Mason v. Missouri,* 179 U. S. 328, 45 L. Ed. 214, 21 S. Ct. 125; *United States v. Harris,* 106 U. S. 629, 27 L. Ed. 290, 1 S. Ct. 601; *United States v. Cruikshank, et al.,* supra; *United States v. Reese,* 92 U. S. 214, 23 L. Ed. 478; *Minor v. Happersett,* supra.) However, these amendments prevent the states, or the United States, from giving preference to one citizen of the United States over another on account of race, color or sex. Before their adoption this could be done; now it cannot. (*Minor v. Happersett,* supra; *Guinn v. United States,* supra.) If citizens of one class having requisite qualifications are *permitted by law to vote,* those of another class having the same qualifications must be permitted to vote. Previous to these amendments, there was no *constitutional guarantee* against this discrimination; now there is. They invested the citizens of the United States *with a new constitutional right.* (*United States v. Reese,* supra.) That right is exemption from discrimination in the exercise of the right to vote on account of race, color, or sex. Hence, *federal protection* extends only to the express prohibitions of the amendments, but does not extend beyond the subjects with which the amendments deal and there is nothing in them which authorizes the exertion of federal power to weigh considerations in a state with respect to the "economic status" or the "place of residence"

of a voter within the state, when considering the validity of a state apportionment plan.

On February 4, 1964, the Twenty-fourth Amendment added the prohibition that no state may impose the payment of any poll or other tax as a condition to vote in any primary or other election for President or Vice President, or electors for President or Vice President, or for Senators or Representatives in Congress. (*McPherson v. Blacker*, supra.) Thus, it is only when a state denies or abridges the right of a qualified elector to vote at a state election because of race, color, sex or tax extraction that these three amendments authorized the federal judiciary to strike down a state statute or constitutional provision, or authorize the Congress to interfere and provide punishment. (*United States v. Harris*, supra; *United States v. Reese*, supra; *Lane v. Wilson*, 307 U. S. 268, 83 L. Ed. 1281, 59 S. Ct. 872; *James v. Bowman*, supra; *Guinn v. United States*, supra.)

From the foregoing, it is obvious that the right of a qualified elector to vote in federal and in state elections is conferred by distinctly different constitutions—in a *federal election* for congressmen and United States senators, the right is conferred by the Constitution of the United States (Art. 1, § 2; Seventeenth Amendment), and in a *state election* for state officers, including members of the legislature, the right is conferred by the Constitution of Kansas (Bill of Rights, §§ 1, 2; Art. 4, § 1; Art. 5, § 1), except that Kansas may not deny the right to vote on account of race, color, sex or tax extraction. (*McPherson v. Blacker*, supra.)

I agree that "the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections" (p. 523), but unless it is carefully analyzed, the majority's broad statement is misleading. As just noted, the protection afforded in a federal election is derived from a different source in the Constitution than the protection afforded in a state election. In a *federal* election, voting privileges are constitutionally protected in the sense that Article 1, Section 2, and the Seventeenth Amendment directly confer the right to vote for congressmen and senators, which is a privilege and immunity of national citizenship that is secured against interference by private individuals as well as against interference by action of the states. On the other hand, the Constitution does not directly confer the right to vote in a *state* election upon anyone. That right is derived solely from the state Constitution and is not a privilege and immunity of national citizenship. While

the right to vote in a state election is not conferred by the Constitution, it is, however, constitutionally protected to the extent that the state may not discriminate against voters as to the subjects with which the Fifteenth, Nineteenth, and Twenty-fourth Amendments deal.

No one disagrees with the majority's statement that the right to vote is a personal right. The right is basic to our republican form of government and is the bed-rock of our free political system; it is the means by which both state and federal governments are continued. I agree that the right of suffrage is a fundamental matter in a free republic and that the right to exercise the franchise in a free and unimpaired manner is pervasive of other basic, civil and political rights. Under the Constitution of Kansas every citizen, individual and elector, is each one possessed of equal inalienable rights to life, liberty and happiness. (Bill of Rights, § 1.) All citizens live under the same indiscriminating sunshine, breathe the same free air, venerate the same historical past, are imbued with the same political ideals and look forward to equal share in the common places of higher civilization in a bright future, and they all may participate fully in the exercise of the political power in the free government of Kansas which was founded on their authority and instituted for their equal protection and benefit. (Bill of Rights, § 2.) Likewise, I am in accord with the majority's statement that it should carefully scrutinize any classification which allegedly infringes the right of citizens to vote, but before federal judicial power may properly be asserted, *there must in fact exist an actual infringement of a constitutionally protected right.* Hence, I carefully search for any constitutionally cognizable principle which would sustain the majority's declaration that the seats in both houses of a bicameral state legislature must be apportioned on a population basis.

Under the record in this case, every Kansas citizen who possesses the qualifications of an elector has the right to freely vote for the candidate of his choice in all state-wide, county-wide, city-wide, district-wide and township-wide elections. No Kansas citizen's right to vote for state representative has been *denied,* nor has he been deprived of the right to have his vote *counted,* nor has his ballot been *destroyed, altered* or *diluted* by ballot-box stuffing. Laws of this state protect all voters from these reprehensible consequences. (K. S. A. 21-801—21-824.) No Kansas citizen has been denied any

right protected by the Constitution upon which the federal judicial focus might be concentrated or for which the majority could grant judicial protection based upon *an outright denial of the right to vote* on account of race, color, sex or tax extraction. But the crux of *Reynolds* is the majority's declaration that *the right to vote can be denied* by a "debasement" or "dilution" of the "weight" of a citizen's vote as effectively as by wholly prohibiting the exercise of the right. It then concludes that "diluting the weight of votes because of *place of residence* impairs basic constitutional rights" (p. 529), for the reason that "the weight of a citizen's vote cannot be made to depend *on where he lives.*" . (p. 530.) (Emphasis supplied.)

From at least these assumptions the majority has concluded that the right to vote can be denied by a debasement or dilution of the weight of the vote because of *place of residence of the voter.* That is the majority's basic premise and upon which it drives its stake claim to afford relief against state action. I find nothing in the Constitution which supports the majority's conclusion. It has erroneously attempted to create a federal right by judicial fiat to afford protection where no right is given; it has reached beyond the federal power which the Constitution confers.

The Fifteenth, and later the Nineteenth, and still later the Twenty-fourth Amendments were adopted to prevent the states from infringing upon or discriminating against voters in state elections (*McpҺerson v. Blacker,* supra), and they afford the only constitutionally protected rights with respect to the voting process which the federal judiciary may enforce against state action. Discrimination in any form to thwart equality in the exercise of the right of franchise in state and federal elections—either sophisticated or simple-minded—is still discrimination, and it may be attacked on the express grounds specified in the individual amendments (*Lane v. Wilson,* supra; *Guinn v. United States,* supra; *Myers v. Anderson,* 238 U. S. 368, 59 L. Ed. 1349, 35 S. Ct. 932), or discrimination affecting the exercise of the right of franchise in violation of their specific prohibitions may be enforced through the Equal Protection Clause of the Fourteenth Amendment. (*Mason v. Missouri,* supra; *Williams v. Mississippi,* 170 U. S. 213, 42 L. Ed. 1012, 18 S. Ct. 583; *Pope v. Williams,* supra; *Nixon v. Herndon,* 273 U. S. 536, 71 L. Ed. 759, 47 S. Ct. 446; *Nixon v. Condon,* 286 U. S. 73, 76 L. Ed. 984, 52 S. Ct. 484; *Davis v. Schnell,* 81 F. Supp. 872, affirmed *Schnell v. Davis,* 336 U. S. 933, 93 L. Ed. 1093, 69 S. Ct. 749.) See, also, *Anderson v.*

*Martin,* 375 U. S. 399, 11 L. Ed. 2d 430, 84 S. Ct. 454, where the discrimination based on color was directed against the candidate and not the voter.

In the first of two "white primary" cases, *Nixon v. Herndon,* supra, the plaintiff, a Negro citizen, was in every way qualified to vote in the party primary except that a Texas statute provided, "in no event shall a Negro be eligible to participate in a Democratic primary election held in the state of Texas." (p. 540.) It was contended the statute violated both the Fourteenth and Fifteenth Amendments in denying the plaintiff the right to vote. Mr. Justice Holmes said:

". . . We find it unnecessary to consider the Fifteenth Amendment, because it seems to us hard to imagine a more direct and obvious infringement of the Fourteenth. That Amendment, while it applies to all, was passed, as we know, with a special intent to protect the blacks from discrimination against them. . . . The statute . . . assumes to forbid Negroes to take part in a primary election . . . discriminating against them *by the distinction of color alone.* States may do a good deal of classifying that it is difficult to believe rational, but there are limits, and it is too clear for extended argument *that color cannot be made the basis of a statutory classification affecting the right set up in this case."* (pp. 540-541.) (Emphasis supplied.)

In the second case, *Nixon v. Condon,* supra, the Texas statute authorized the state executive committee of a political party to prescribe qualifications of members and to determine who shall be qualified to vote in its primaries. A resolution of the state Democratic executive committee limited the right to participate in its primary election to white persons. The court held that the case was controlled by *Nixon v. Herndon,* supra, and Mr. Justice Cardozo said:

". . . The Fourteenth Amendment, adopted as it was with special solicitude for the equal protection of members of the Negro race, lays a duty upon the court to level by its judgment *these barriers of color."* (p. 89.) (Emphasis supplied.)

In *Davis v. Schnell,* supra, the court invalidated a constitutional provision of Alabama, providing for a literacy test as a suffrage requirement upon the ground that it violated both the Fourteenth and Fifteenth Amendments. It was held that the provisions of the Constitution providing that only persons who can "understand and explain" any article of the Constitution of the United States to the reasonable satisfaction of the Board of Registrars may qualify as electors, attempted to grant to that board arbitrary power to accept or reject any prospective elector and violated the Equal Protection Clause. It was also held that the Fifteenth Amendment guarantees

the free exercise of the right of franchise as against state discrimination based on race or color. The Supreme Court affirmed, *per curiam,* citing *Lane v. Wilson,* supra, *Yick Wo v. Hopkins,* 118 U. S. 356, 30 L. Ed. 220, 6 S. Ct. 1064, and *Williams v. Mississippi,* supra.

In *Pope v. Williams,* supra, *Williams v. Mississippi,* supra, and *Mason v. Missouri,* supra, it was held that state action (determining voter qualification and voter registration) did not violate the Equal Protection Clause.

In the *Nixon* cases the discrimination found to exist was based upon race or color, which are the express prohibitions against unlawful discrimination in the Fifteenth Amendment. It is fair to say that the express prohibitions of that amendment—race or color—were implanted by the court into the Fourteenth amendment as the standard for applying the Equal Protection Clause to strike down a discriminatory denial of the right to vote. But it is obvious that the majority did not rely upon the *Nixon* cases to support its conclusion in *Reynolds* and that it could not for the reason that those decisions involved an outright denial of the right to vote on account of *race* or *color.*

Before and after the *Nixon* cases, the court decided two cases dealing with the qualifications of electors in Oklahoma, which were decided under the Fifteenth Amendment. (*Guinn v. United States,* supra; *Lane v. Wilson,* supra.) The rationale of the *Nixon* cases is almost certainly to be explained by the court's reluctance to decide that party primaries were a part of the electoral process for purposes of the Fifteenth Amendment. See *Newberry v. United States,* 256 U. S. 232, 65 L. Ed. 913, 41 S. Ct. 469. However, once that question was laid to rest in *United States v. Classic,* supra, the court decided subsequent cases involving Texas primaries on the basis of the Fifteenth Amendment. See *Smith v. Allwright,* 321 U. S. 649, 88 L. Ed. 987, 64 S. Ct. 757, and *Terry v. Adams,* 345 U. S. 461, 97 L. Ed. 1152, 73 S. Ct. 809. Likewise, the recent case of *Gomillion v. Lightfoot,* 364 U. S. 339, 5 L. Ed. 2d 110, 81 S. Ct. 125, deciding that a constitutional claim was stated by allegations that municipal lines had been redrawn with intention of depriving Negroes of the right to vote in municipal elections, was based on the Fifteenth Amendment. (*Reynolds v. Sims,* Harlan, J., dissenting, Note 72, p. 557.)

As previously noted, the only constitutional limitations upon state action with respect to the exercise of the right of suffrage in all its forms are the express prohibitions of the Fifteenth, Nineteenth and Twenty-fourth Amendments, and vote weighing to determine "de-

basement" or "dilution" of a ballot because of *place of residence of a voter* is not one of them. No court may look beyond the express provisions of those amendments to measure or strike down a state statute or constitutional provision pertaining to the elective franchise (*United States v. Reese,* supra; *United States v. Harris,* supra), nor may the Equal Protection Clause be used by a court to travel beyond the interstices of those express prohibitions to reach and review alleged discrimination arising directly from the exercise of the right of suffrage. Otherwise, to allow the majority to write its own prohibitions by imposing upon the right of suffrage in state elections such limitations as it might see fit, through interpretation of the Equal Protection Clause, would permit it to write its own amendments to the Constitution in clear violation of the Fifth (V) Article. If Congress may not step outside its constitutional limitations and attempt that which is beyond its reach by enacting statutes which are broader in scope than is warranted by the Constitution with respect to matters pertaining to the right of suffrage in state elections (*United States v. Harris,* supra; *United States v. Reese,* supra), how, then, can the majority's conclusion in *Reynolds,* which likewise exceeds the power conferred by the Constitution with respect to the exercise of the right of suffrage in state elections and which encroaches upon the reserved rights of the states, and the people, be sustained? To ask the question is to answer it. What the majority has done is impose an additional prohibition upon state action, which is beyond the express limitations of the Fifteenth, Nineteenth and Twenty-fourth Amendments, by asserting that the right to vote can be denied by a "debasement" or "dilution" of the weight of the vote because of place of residence of the voter. This is clearly unconstitutional action, and it begs the question to say that this additional prohibition may be found in or protected by the Fourteenth Amendment.

I do not enter into the debate of the political question whether a bicameral state legislature should or should not be apportioned on the basis of population, and decide in the light of present-day social and economic conditions for or against the wisdom of that policy. Whether social, moral and economic interests have been bettered by a particular governmental policy is not a judicial question. But before concluding this dissent, I feel compelled to note there is nothing in the Kansas plan apportioning at least one representative to each county which, on its face, is unconstitutional for any reason suggested in *Reynolds.* There is nothing written into this plan that is invidious or purposely discriminatory. It operates uniformly

throughout the state by providing residents of each county with the right to vote for the representative of their choice, and the inequality of vote weighing which *Reynolds* condemns does not result from state action under the Kansas plan—it is produced only by the free choice of Kansas citizens to live where they choose. Their right of free movement is an incident of state citizenship and the state may not interfere with that movement nor compel them to live in one place in the state rather than another. The fact that some citizens choose to live in a sparsely populated county, others in a medium populated county, and still others in a more densely populated county, is the result of their free choice as citizens. Hence, it is not state action—the Kansas plan—that produces the majority's inequality and unequal vote weighing, but clearly it is the free choice of citizens to live where they will. Obviously, the majority can find no solace in the Equal Protection Clause to buttress its conclusion that the weight of a citizen's vote cannot be made to depend on where he lives, and, in the name of "equality," strike down the Kansas plan as *discriminatory state action.*

If it is the aim of the majority to "break down the rights reserved by the constitution to the states as a bulwark against that consolidation, the fear of which produced the whole of the opposition to the constitution at its birth" (10 Writings of Thomas Jefferson, [Ford ed. 1899] pp. 225, 226), it has then become what Mr. Dickinson said in debate in the Constitutional Convention of 1787, when he observed that "the Justiciary of Aragon became by degrees the lawgivers." If this be the case, it is then apparent that what Charles Wallace Collins wrote in his book entitled "The Fourteenth Amendment and the States," may have been justified. He said:

". . . In the hands of a Supreme Court with radical centralizing views the Fourteenth Amendment could become a rod of iron to beat the people of the United States into one consolidated empire whose word of law, in matters light as well as weighty, should emanate from Washington." (p. 150.)

Mr. Justice Holmes has said, "Great constitutional provisions must be administered with caution." (*Missouri, Kansas & Texas Ry. Co. v. May,* 194 U. S. 267, 270, 48 L. Ed. 971, 973, 24 S. Ct. 638.) I submit there should be a symmetrical development of the Fourteenth Amendment, consistent with history and experience, which has been the moving force in defining its contours and giving shape to existing rules. When the historical facts are examined, I find that the indicated intent of the Fourteenth Amendment, the historical

setting of its birth, the impressive assent of American leaders, and its practical operation in governmental affairs for approximately 100 years, clearly outweigh the sweeping pronouncements in *Reynolds* and related cases. To this I may add that, when fifteen of the so-called loyal states; at least six of the so-called reconstruction states; at least six of the states admitted after the Fourteenth Amendment was adopted, and the Congress of the United States, have, for approximately a century, accepted the constitutional philosophy that state legislatures should exercise their constitutional power to apportion their respective legislative seats in accordance with their apportionment provisions, and when this has received the approval of the leading appellate courts of the country, including the approval of the Supreme Court of the United States in at least four separate cases (*Colegrove v. Barrett*, 330 U. S. 804, 91 L. Ed. 1262, 67 S. Ct. 973, and *Remmey v. Smith*, 342 U. S. 916, 96 L. Ed. 685, 72 S. Ct. 368, dismissed for want of a substantial federal question; *Kidd v. McCanless*, 352 U. S. 920, 1 L. Ed. 2d 157, 77 S. Ct. 223, appeal dismissed without dissent; *Radford v. Gary*, 352 U. S. 991, 1 L. Ed. 2d 540, 77 S. Ct. 559, affirmed dismissal of action without dissent), at times when it included Chief Justice Vinson, Chief Justice Warren, Justices Black, Reed, Frankfurter, Douglas, Jackson, Burton, Rutledge, Clark, Minton, Harlan and Brennan, it is a very late day indeed to say that state constitutional apportionment provisions violate fundamental constitutional rights. It is hardly reasonable to suppose that legislative bodies over so wide a territory, including the Congress of the United States, and eminent judges of the highest courts, have knowingly defied the constitution for so long a period, or that they have acted in ignorance of the meaning of its provisions. Particularly is this so when just a few short years ago, the Supreme Court said:

". . . To assume that political power is a function exclusively of numbers is to disregard the practicalities of government. Thus, the Constitution protects the interests of the smaller against the greater by giving in the Senate entirely unequal representation to populations. It would be strange indeed, and doctrinaire, for this Court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former. The Constitution—a practical instrument of government—makes no such demands on the States." (*MacDougall v. Green,* 335 U. S. 281, 283, 284, 93 L. Ed. 3, 69 S. Ct. 1.)

The constitutional principle is the same now as it has been throughout this period; and if conditions have changed so that state apportionment on a geographical basis in at least one house of a bicameral state legislature is no longer wise or proper, this is a matter for the Congress to submit by constitutional amendment to the states and not for the majority to attempt to correct by an unconstitutional interpretation of the Equal Protection Clause. That is what George Washington had in mind when he told the people of the United States in his farewell address on September 17, 1796:

". . . If, in the opinion of the people, the distribution or modification of the constitutional powers be in any particular wrong, let it be corrected by an amendment in the way, which the constitution designates. But let there be no change by usurpation; for, though this, in one instance, may be the instrument of good, it is the customary weapon by which free governments are destroyed. The precedent must always greatly overbalance in permanent evil any partial or transient benefit, which the use can at any time yield." (12 Sparks, Life and Writings of Washington, p. 226.)

Any conclusion other than what has been arrived at in this dissent would cause the Fifteenth, Nineteenth and Twenty-fourth Amendments to become mere surplusage. If constitutional amendments were the only means by which the people of this nation could guarantee to all men and, later, women, the right to vote at all, and still later, to preclude the states from imposing as a condition of the right to vote, the payment of a poll tax, it is reasonable to assume the people would have deemed it necessary to adopt a constitutional amendment requiring that state apportionment be based on population alone, in the absence of language in the Fourteenth Amendment clearly expressing such a requirement. But more than that, the Twenty-fourth Amendment was proposed by Congress after *Baker v. Carr,* supra, was decided. Joint Resolution No. 29 proposing it was passed by the Senate on March 27, 1962; it passed the House on August 27, 1962, and was submitted to the states for ratification on September 14, 1962. It was declared to be a part of the Constitution on February 4, 1964, shortly before *Reynolds* was decided. It is evident Congress deemed it necessary to submit the Twenty-fourth Amendment which occurred during the period the Supreme Court had under consideration state apportionment questions, but it would seem to have been a futile gesture on the part of Congress to submit and the states to ratify it, when, according to *Reynolds,* the majority can now find "discoverable" and "manageable" standards in the Equal Protection Clause to determine the constitutionality of state apportionment plans, and it should

have presented no problem for the majority to have also discovered "manageable" standards to eliminate a mere poll tax as a condition to vote.

I have diligently searched for any cognizable constitutional principle which would sustain the majority's opinion in *Reynolds*, but I find none. I think it has been established beyond doubt that the conclusions announced in that case are not only unauthorized by the Fourteenth Amendment, but represent nothing less than the majority's attempt to write its own amendment to the Constitution of the United States in clear violation of the Fifth (V) Article, and being without legal sanction, such conclusions are not the Constitution of the United States and are not binding upon state courts or the judges of those courts under the Supremacy Clause of the Sixth (VI) Article.

I insist that the majority of the Supreme Court of the United States correct what seems to me to be clear judicial error, and retreat from the height to which it has ascended by its unwarranted judicial interpretation in *Reynolds* and related cases, to a sound, historical and legal construction of the Fourteenth Amendment. That amendment was the work of Congress and the ratifying states, and was not the product of the majority's opinion in *Reynolds*, notwithstanding the lofty eminence of those members of the Supreme Court who concurred therein. Had the framers who proposed and the Congress which submitted the amendment intended that it regulate *per se* state apportionment and prescribe a standard based on population alone, they would have declared such a policy in express terms. Such an important matter affecting our dual federal system would not have been left unattended. The misgivings the majority have of the historical concept of our dual federal system should not permit it to write into the amendment its own notions of what is presently politically or socially best to cure the nation's ills since a majority of succeeding members may, due to changing times, have completely different notions as to what those political or social cures may be. Surely, the Constitution and the Fourteenth Amendment mean more than that. Moreover, the Equal Protection Clause "should not be distorted to make the federal courts the supervisor of state elections [state apportionment]. That would place the federal judiciary in a position 'to supervise and review the political administration of a state government by its own officials and through its own courts (*Wilson v. North Carolina,* 169 U. S. 586,

596, 42 L. Ed. 865, 871, 18 S. Ct. 435)'—matters on which each state has the final say." (*Snowden v. Hughes,* 321 U. S. 1, 88 L. Ed. 497, 64 S. Ct. 397, Douglas, J., dissenting.)

In writing this dissent, I cast no reflection whatsoever upon the eminent members of the Supreme Court of the United States who constituted the majority in *Reynolds* and who attempted to exercise the duties imposed upon them with care and with sincere desire for the general welfare; however, we are dealing with an important and far-reaching constitutional question concerning the powers of government, both federal and state, which do not permit integrity or good intention to take the place of essential constitutional action.

I would enter judgment for the defendants. In my opinion, the Kansas apportionment plan prescribed by Article 2, Section 2, and Article 10, Sections 1 and 2, and currently placed into effect by K. S. A. 4-103, which has previously received judicial approval of this court, does not conflict with any provision of the Constitution of the United States, including the Fourteenth Amendment, and in particular the Equal Protection Clause thereof.

I am authorized to say that Mr. Chief Justice Parker and Mr. Justice Wertz concur in this dissent.

FONTRON, J., concurring: I find myself in agreement with many of the sentiments expressed by Justice Fatzer in his scholarly dissenting opinion. Nevertheless, this court, as a responsible judicial body, is bound by the Supremacy Clause of the United States Constitution. For this reason, I am convinced that, in good conscience, we are obligated to follow the clearly expressed mandate laid down in *Reynolds v. Sims,* 377 U. S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 362, and related cases.

PRICE and SCHROEDER, JJ., join in the foregoing concurring opinion.